**L. GREIF & BRO., Inc. (CARROLL WORKERS' ASS'N OF WESTMINSTER, Intervenor) v. NATIONAL LABOR RELATIONS BOARD.**

No. 4517.

Circuit Court of Appeals, Fourth Circuit.

Dec. 28, 1939.

Leonard Weinberg and Harry J. Green, both of Baltimore, Ind. (Weinberg, Sweeten & Green, George Dowell, and Dulany Foster, all of Baltimore, Md., on the brief), for petitioner L. Greif & Bro., Inc.

D. Eugene Walsh, of Westminster, Md., for petitioner Carroll Workers' Ass'n of Westminster, intervenor.

Ruth Weyand, Atty., National Labor Relations Board, of Washington, D. C. (Charles Fahy, General Counsel, Robert B. Watts, Associate General Counsel, Laurence A. Knapp, Asst. General Counsel, Samuel Edes and Solbert M. Wasserstrom,

Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before SOPER and NORTHCOTT, Circuit Judges, and LUMPKIN, District Judge.

SOPER, Circuit Judge.

On April 12, 1937 the constitutionality of the National Labor Relations Act of July 5, 1935, 29 U.S.C.A. 151 et seq., was for the first time authoritatively established by the Supreme Court in National Labor Rel. Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, and the contrary view generally held by the lower courts was overruled. Thereupon the Amalgamated Clothing Workers of America, Baltimore Joint Board, an affiliate of the Congress of Industrial Organization, renewed its efforts which for some years past it had unsuccessfully pursued, to unionize the 600 workers, employed by L. Greif & Bro., Inc., a clothing manufacturer, at its two plants at Westminster, Maryland. These occurrences gave rise to questions in the minds of the employees, most of whom were women, as to their rights under the new order of things, and the local management at the factory was asked for information. For several years prior thereto, the employees had been associated in a labor and beneficial organization called the Carroll Mutual Benefit Association, which had represented them in collective bargaining with the Greif Company. Being uncertain as to the legal situation, the management at the head office of the company at Baltimore consulted Leonard Weinberg, its attorney, and he advised that it was unwise for the company to continue to deal with the Carroll Association because in the past the company had given some money to it and had granted certain favors, such as contribution of ice cream on the occasion of dances, permission to hold meetings on its property, etc. As a result, the attorney was requested to go to Westminster and attend a public meeting of employees in the town in order to answer questions of the employees and to settle their doubts.

The meeting of employees was accordingly held on the morning of April 29, 1937 in the Armory in the town, and a discussion took place which will be hereafter set out in detail. On May 3, at another meeting of the employees called of their own motion at a public hall in the town, a new association was formed under the name of the Carroll Workers' Association of Westminster. It was joined at once by approximately 450 of the 600 employees. On May 13 a committee of the Association requested of the management that the Association be recognized as the exclusive collective bargaining agency of the workers, and on May 15, recognition was granted. On June 30 the Company and the Association entered into a written contract concerning wages, hours and working conditions for the period of a year, and thereafter from year to year unless terminated by notice by either party. The contract provided for a ten per cent wage increase, and also that upon written authorization from individual employees, dues to the Association would be checked off from their wages.

The evidence shows beyond a reasonable doubt that the great majority of the workers got the kind of representation that they desired by the formation of the new association; and it is also a safe assumption that the employer was pleased that the workers preferred to be represented by employees of the plant selected by the Association rather than by outside organizers of the Amalgamated. No labor trouble preceded the formation of the new Association and the demand for increased wages which arose shortly thereafter was quickly met. But this seemingly satisfactory treatment of the situation did not suit the Amalgamated; and so it filed a complaint with the Labor Board on June 24, 1937, charging that the Greif Company had dominated and interfered with the formation and administration of the new Association. The usual procedural steps were taken, the Carroll Association was allowed to intervene in the proceedings, and evidence was offered on both sides before a trial examiner whose report sustaining the complaint was filed on December 17, 1937. The case was argued orally before the Labor Board on January 12, 1938 upon exceptions to the report, and after a delay of some eighteen months the Board rendered its decision. The Greif Company was directed to cease and desist from dominating or interfering with the administration of the Association and from giving effect to the contract between the Company and the Association, and from interfering in any other manner with the employees in the exercise of their rights to form or join labor organizations and bargain collectively through representatives of their own choosing; and the Greif Company was further ordered to withdraw all recognition from the Association as the representative of the employees

for the purpose of collective bargaining, to completely disestablish the Association, to reimburse the employees for the dues which it had checked off on their wages on behalf of the Association, and to post notices of the order in conspicuous places in its Westminster plant. The question before us is whether the evidence now to be summarized, which is largely undisputed, furnished justification for this action of the Board. The Greif Company has petitioned this court to review and set aside the order of the Board.

The meeting at the Armory on April 30, 1937 was attended by the Mayor, the President of the Council, the City Attorney of the town, and also by a retired contractor, the cashier of the local national bank, and the wife of a dentist resident in the town. All of them were invited by the management, and four of them were members of the Chamber of Commerce. Present also were two officials of the Greif Company, Mr. Weinberg, the attorney of the Company, and a court stenographer whom he had brought from Baltimore. The employees of the plant were present at the direction of the management. The stenographer's report of the meeting shows that the Vice President of the Company briefly explained that the meeting had been called in order that the lawyer of the Company might answer the numerous questions asked by the employees as to the meaning of the recent Supreme Court decisions, and that representative citizens of the community had been invited to be present in order that in the future no question might arise as to what had taken place at the meeting and no one might charge that the management had attempted to coerce or influence the employees in any way. Mr. Weinberg was then introduced, and after some general introductory remarks made the following speech:

"There is really nothing complicated and nothing mysterious at all about the decision of the Supreme Court on the Wagner National Labor Relations Act. The Supreme Court has held that the Wagner National Labor Relations Act is constitutional. Without going into all the details of the Act, the decision upholds the right of workers everywhere, not only in this plant, but in everybody's plant, to bargain collectively with their employers, if they wish to. It decided that employees may or may not form their own labor organization or join an outside labor organization without any interference from their employers.

"The right to bargain collectively is nothing new. As a matter of fact, it is nothing new to you. You have done it through your own organization. Collective bargaining means that instead of you individually going to the boss or to the management each time that you have a grievance or a complaint, or when you want a raise in wages or a change in hours of labor, anything of that sort, instead of doing that individually, you all get together as a group and elect representatives and have those representatives speak for you. So that collective bargaining, therefore, really means that instead of individually dealing with your employers, you have the right to form a labor organization or to join one and to have that organization deal with your employers for you as to your wages, your hours, your conditions of employment and working conditions.

"The decision also holds that employers may not assist in the formation of any labor organization, nor may they prevent the formation of any such organization, nor may they interfere with or prevent your joining an organization which you want to join and have it act for you. Therefore, you will understand we can have nothing to do with it.

"I understand you have had an organization here which came into existence long before I became counsel for the Company, an organization known as the Carroll Mutual Benefit Association which, I understand, is the association which has represented you heretofore in dealing with the Greifs. It may be that at some time they assisted in the formation of this organization or in helping you to get along, such as making a donation of ice cream on some occasion, or something like that. I do not know whether they ever have. But they may have had at some time something to do of that nature, in connection with your organization. The decision of the Supreme Court is that your existing organization is no longer a legal organization for use as a representative of the workers. For the reasons I have suggested it could not be used, even if you wished to use it, as your representative in collective bargaining. So that, therefore, you now have three choices, as I see it—and I do not care what anybody else tells you; you will hear all kinds of reports about it, so unless you talk to a lawyer or to a business man who knows what the law is, who has read it, or unless you get the law and

read it for yourselves, you won't understand it.

"As I started to say, you have three choices. First, you can absolutely refrain, if you wish, from joining any labor organization. Nobody can make you join and nobody can prevent you from joining. That is the first thing. Second, you can join an outside union, but nobody can make you join and nobody can prevent you from joining. Or, third, you can form your own labor organization, control and manage it yourself, and have it represent you.

"Now, those are the three choices that are open to you today. Your employers, the Greifs, or any of the foremen or anybody in authority at the Greif plant, can not tell you in any way whether you should form an organization, whether you should join or not join a labor organization, or which one. You are free to form your own, you are free to join your own, you are free to join some outside union, some other union, or to refuse to join a union or refuse to form a labor organization. And you can depend upon it that you will not be discriminated against by L. Greif & Brother, or by any representative of theirs, whichever course you take in the matter. If you desire to become a member of some outside union and have them represent you, nobody can interfere with you and nobody will. If you desire to form a new organization yourselves in place of the Carroll Mutual Benefit Association which, under the law, can no longer represent you, nobody can interfere with you and nobody will. If you desire to form a new organization yourselves in place of the Carroll Mutual Benefit Association which, under the law, can no longer represent you, you have the absolute right to take that course. If you do decide to do that, the law prevents L. Greif & Brother, or any representative of L. Greif & Brother, any foreman of theirs, or anybody else who is in a superior position to you in the plant, from helping or assisting you in doing it. They can not assist in the formation or in the maintenance of that kind of organization any longer.

"You may, however, if you wish, get yourselves a lawyer, go to some reputable citizen of the community, not connected in any way with L. Grief & Brother or with anybody in authority here, and have them advise you how to go about it, if you do not know how to go about it yourselves.

"If your organization represents the majority of the workers in the plant, then that organization, under the law, will have the right to bargain collectively for all of the employees in the plant. In any event, we want you to know that we stand ready and willing at all times, as we always have, to listen to and to try and satisfy any suggestions or any complaints or any requests that you individually or collectively through your own organization, or some other organization, wish to make. And you may, but you don't have to, go outside of your group to select representatives to deal with L. Greif & Brother on your behalf. You can, but you don't have to, contribute to any one for the privilege of having them represent you in any dealings with your employers."

The speaker then invited questions from the employees, whereupon the following interchange, in summary, took place: He was asked whether the law or the Amalgamated could compel Greif to keep its plant open in Westminster, and whether, if the employees formed a union in the plant, it would be responsible to any other union and be obliged to go out in sympathy with any one else in the United States; and he answered these questions in the negative. He was asked what per cent of the employees an inside union must have in order to keep from being bothered by an outside union, and he explained that a labor organization must be composed of the majority of the workers in order to have the authority to represent the employees, and that an organization composed of such a majority, whether it was formed by the employees or joined by them, would have the right to elect representatives who would have the authority to represent all the employees in dealing with the management with respect to wages and working conditions, and the management would be obliged to deal only with such representatives.

Mrs. Helen M. Rickell, one of the employees, then arose and addressed the meeting. It afterward transpired that the Amalgamated had recently solicited her membership without success, and she subsequently became the chairman of the Carroll Workers' Association, which was organized shortly thereafter. The stenographer's report contains the following account of her remarks and of the reply of the attorney:

"I have been accused of being a Union worker, I mean by several of them. I am not for the Union, but I am for better wages and less working hours. We have

been working terribly hard in the Pants Department, long hours. I am talking for all those who will stick with me, and I know they will. But I am not for the Union. I believe if they would organize their own organization, we could do something, and I make a motion for it. (Applause.)

"Mr. Weinberg: Mr. Irvin Greif is here and he has heard what you said, and in addition to that, when I get back to Baltimore, I will tell the other members of L. Greif & Brother what you have said.

"As to your making the motion you have suggested to form your own organization here, we can not have anything to do with it, unfortunately; I am sorry to tell you the law prevents us from helping you to do that this morning. We got this hall for this meeting and the Labor Board might say we got the hall in order to do this, we are using our own hall for that purpose.

"But there is no reason in the world—the applause that you all gave seems apparently to be in compliment of what Mrs. Rickell said, that you are having too long hours and not making enough money, also that you want to join or form your own organization.

"Let me explain to you about this. If you form your own organization and your representatives go to Mr. Mannino or Mr. Greif and make the suggestion or the complaint you have made the law provides that Mr. Greif will have to deal with you. I believe after all these years you know he would deal with you anyhow. There is no reason why you should not express yourselves here or anywhere else. But I would ask you, if you are going to form an organization, or if you are going to join one, whether it is in existence now or not, not to do it here this morning, because we can not have anything to do with it ourselves. We might be charged by some one who is antagonistic to it, on the inside or outside, of having fostered the thing. You have a perfectly good organization now, I am told, which has been in existence for some time. We could not deal with that organization any longer, however, because some time in the past we may have assisted in your giving a dance, we may have assisted it to the extent of giving them a hall; we may have donated ice cream, or something of that kind. Some people contend that is influencing and coercing the employees. Therefore, we can not let you do that in here this morning. But you can do it the minute you walk out of here.

"I just want you to understand you have the right to do what you want to do. If you do not know how to do it, I can not show you, but there are other lawyers much better than I am. There are plenty of business men, there are plenty of business men, there are plenty of people among you, I am sure, who must know your business, and can show you how to do what you want to do.

"Mrs. Rickell: If we do organize our own organization, that will make the Union let us alone, will it?

"Mr. Weinberg: I will say this: If you do organize your own organization and anybody attempts to interfere with it, you go directly to the National Labor Relations Board in Washington and lodge your complaint there. We can not do it for you. But you have the United States Government behind you in anything that the majority wants to do.

"Mrs. Rickell: Thank you. (Applause.)

"Mr. Weinberg: You understand the Act prevents us from making any complaints for you, we can not do it, the management can not do it. This National Labor Act is an act for the benefit of employees, not for the benefit of the employer. It gives the employees the right to organize and to be free from any influence of the employer, and the National Labor Relations Board, I am sure, will protect those rights, your rights.

"Is there anything else?"

It has seemed necessary to set out the proceedings at the meeting with completeness in order that the reasonableness of the Board's comment thereon might be appraised. In its opinion the Board said:

"While Weinberg presented to the employees three possible courses of action, we are of the opinion that he placed special emphasis on one of them—that of forming an inside union. He stated that the employees had the right to form a new organization in place of the Carroll Mutual Benefit Association, which he referred to as a 'perfectly good organization' and gratuitously remarked that the applause given to Rickell indicated in part that the workers favored a plant union. Stating that 'unfortunately' the respondent could not help them, he said that they were free, immediately on leaving the meeting, to form a new organization. By declaring that the workers could, though they did not have to, contribute to anyone to represent them in collective bargaining,

Weinberg voiced an argument against a union of the affiliated type; by suggesting that advice might be obtained from 'other lawyers' or 'plenty of business men'—persons to whom it would be unnecessary for employees to turn if they desired to join a union affiliated with a national organization—he pointed the way toward the formation of an inside union".

In reaching this conclusion, the Board has brought together a number of statements, apart from the context, which support its argument. The patent fact is that the emphasis upon the inside union first appeared in the discussion in the questions of the employees who favored such an organization, and that the statements of the attorney, upon which the Board especially relies, were made in response to the questions. Moreover, it is obvious that if the numerous statements in the speech, that the employees were free to join any kind of union that they pleased, were assembled in a single paragraph, they would show that the legal right of the employees to organize, and in so doing to be free from the domination or interference of the management, and to have the protection of the statute and of the Board, was made abundantly clear.

Organization of a new association of workers followed quickly upon the heels of the meeting at the Armory. Mrs. Rickell and other women approached the City Attorney in the Armory and requested his help; but he refused to discuss the matter in the Armory and told them to see him the next day. They were unwilling to wait, and after the workers had returned to the plant, the leaders of the movement arranged another meeting for the afternoon of the same day and word was passed around the plant. At 3 o'clock, shortly before the regular closing time, Mrs. Rickell caused the closing bell to be rung and most of the workers assembled at another hall in the town. Mr. Gehr, a hardware dealer and the President of the Chamber of Commerce, was invited by the workers to be present. He told the workers that they could join an outside union or have a union of their own and that the citizens of Westminster would be behind them whichever way they went. No business was transacted, however, since the hall was small and there was a great deal of confusion, and it was decided to meet on the following Monday, May 3, at the Armory.

The next day, Saturday, was not a working day and a number of employees visited the office of Mr. Walsh, the City Attorney, and secured his promise to prepare a constitution and by-laws for the proposed organization and have them ready on the following Monday. On Monday afternoon, May 3, at 3 o'clock, the closing bell was again caused to be rung by Mrs. Rickell, and practically all of the employees stopped work and went to the Armory for another meeting. Employees were paid for the time lost at the meeting on the morning of April 29, but not for the time lost at the subsequent meetings. Mr. Walsh was present at the meeting and stated that he had been requested to prepare a constitution and by-laws for an organization but that the workers did not have to join any organization unless they wanted to, and that they could join an outside union if they wished. Membership applications were distributed and signed by approximately 450 workers. The chairman ascertained that some supervisory employees and some office workers were present, and directed them to leave, which they did. Mrs. Rickell was then elected temporary chairman of the meeting, and asked for a vote as to what the workers wanted, and by what appeared to be a unanimous vote, they voted in favor of forming a labor organization. The proposed constitution and by-laws of the Carroll Workers' Association of Westminster, the new inside union, which had been prepared by Mr. Walsh were then adopted; and permanent officers were elected by ballot. Local townspeople, who took no other part in the meeting, were called upon to act as tellers. On May 12, 1937 another meeting was held and a committee was selected to request that the Greif Company grant recognition to the Association as the exclusive bargaining agency for the workers. On May 13, the committee went to the Baltimore office of the Company and offered to show signed membership cards of 449 out of 566 employees. It does not appear that the Company attempted to verify the cards at this meeting, but subsequently the cards were checked against the pay roll, and on May 15 the Company stated in writing that it would recognize the Association as the bargaining agency of the workers at Westminster.

Negotiations between representatives of the Association and of the Company followed. The representatives of the Asso-

ciation endeavored to secure a twenty per cent increase in wages, a closed shop and a check off of the Association's dues; but in the end the parties adopted a contract under date of June 30 for the term of one year and thereafter from year to year unless terminated by notice by either party, which provided for an increase of ten per cent in wages, a 36 hour week and a check off from the wages of the members of their dues to the Association, on condition that the individual members should authorize it and the Association request it. It was also provided that if differences should arise between the parties to the contract, which could not be satisfactorily adjusted, the questions should be submitted to arbitrators whose decision should be final. The demand for a closed shop was abandoned upon the advice of the attorney of the Association.

Some time in the month of August, 1937, two meetings of citizens of Westminster were held in connection with picketing at one manufacturing plant in the town and labor trouble at another. Mr. Gehr presided at these meetings. They were attended by substantial citizens, some of whom were members of the Chamber of Commerce and some were not. Statements were made protesting against the disturbance caused by picketing, and one of these statements was made by a member of the Chamber of Commerce. Afterwards a city ordinance against picketing, prepared by the City Attorney, was passed by the City Council.

The Board relies upon a number of circumstances as indicating the employer's preference for an inside union and its domination and interference in the formation of that body. Mention is made of the calling of the first meeting of employees at Westminster shortly after the Supreme Court had spoken and the Amalgamated had been stirred to new endeavor; of the prompt formation of the new body at Westminster upon the disestablishment of the old; and the similar movements by the management with similar results at Greif plants in other localities. It is also stressed that the management invited "representative" citizens to attend the meeting of April 30, but no members of the Amalgamated; that some of the citizens later attended the protest meetings in August; that supervisory employees attended the first meetings of the employees until requested by the City Attorney to leave; that

the meetings of the workers were held during work hours without protest from the management; that solicitation of members and check off authorizations took place at the plant; that the closing bell was used by the employees before time; that on one or two occasions notices of meetings were posted on the time clock in the plant, and that the blank forms for the authorization were mimeographed at the plant at an expense paid by the Association.

In order to complete the picture, it should be added that there is no evidence in the record of discrimination by the management in favor of members of the Association as compared with members of the Amalgamated, in the treatment of employees or in the privileges extended to them. Seven employees were called as witnesses for the Board, six of them being members of the Amalgamated, and most of them being also members of the Association. They testified, without exception, that they understood from the speech of the Company's attorney on April 30 and from other sources that they were free to join any kind of an association, or not to join any association, as they wished, and also that no officer or supervisor of the Greif Company had ever attempted to influence, interfere, or coerce them with reference to membership in the Amalgamated, or in the Association, that no discrimination had been practiced against them because of their membership in the Amalgamated and that no attempt had been made on the part of the management to dominate or interfere with the formation or administration of the Association.

The strength of the Board's position lies in the fact that the management took the initiative in calling the employees together and announcing the disestablishment of the old association of the workers and the impropriety of its further use as a bargaining representative; but the disestablishment and the denial of recognition of an inside union, improperly favored or dominated by the employer, is in harmony with the statute and conforms with the announced policy of the Board. The strength of the Company's position is that it declared the disestablishment of the old association and answered the questions of the workers quite publicly in the presence of responsible and disinterested members of the community; but this of itself is not conclusive. The real query is whether the management has interfered or taken part

in the formation of the new body. It is not an answer to point to circumstances indicating that the management preferred an inside to an outside union, or that citizens in the community entertained a hostile feeling toward the Amalgamated. It goes without saying that the determination of the employees to form their own association and to be free from the outside interference of a national union was influenced by their past experience in the plant, and by the general opinion in the community of which they are a part; but these contacts did not deprive them of their rights under the Act, or require them to choose bargaining representatives offensive to their employer or to their fellow citizens, so long as their choice was not dominated or interfered with by the employer.

We think there is no substantial evidence to show such domination or interference; and that the decisions of the courts do not require or justify the dissolution of the Association. In Ballston-Stillwater K. Co. v. Labor Board, 2 Cir., 98 F.2d 758, 762, it was said: "To constitute domination or interference by the employer we think that it must appear that the employees are acting for him rather than for themselves, or that the employer in some manner gives aid to one group which he withholds from the other, or discriminates in favor of members of a labor organization or against non-members. A union limited to the employees of a single employer is as legal as any other, and we know of no rule of law that forbids the employer to permit his employees to solicit memberships during working hours, provided he does not withhold a like privilege from the opposition and exerts no pressure upon employees to join the union".

In the decision of the Supreme Court in National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., Dec. 4, 1939, 60 S.Ct. 203, 84 L.Ed. ——, 7 USLW 654, the inside union was ordered to be disestablished as the representative of the workers because the organization had functioned for a long time with joint control vested in the management and the men, and the court could not say, notwithstanding the elimination of the unlawful features from the plan, that the effects of the long practice could be eliminated and the employees rendered entirely free to act upon their own initiative without the complete disestablishment of the plan. In the pending case, as we have

seen, the old association was completely disestablished.

In Labor Board v. Fansteel Corp., 306 U.S. 240, 262, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, cited in National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., supra, the withdrawal of recognition and the disestablishment of a newly formed unaffiliated association as a bargaining representative was approved. The facts which led to the Board's order in this case are more fully set out in its opinion, 5 N.L.R.B. 930, 946, where it appears that the formation of the new body was promoted by a prior company-union campaign, and that the association, when formed, was granted favors and privileges denied to the national union, such as joint conferences between representatives of the company and representatives of the employees, the holding of meetings on the company's premises, the use of the company's bulletin board for notices, etc. Such circumstances are absent from the pending case.

A decree of this court will be granted setting aside the order of the Board.