**LINK–BELT CO. v. NATIONAL LABOR RELATIONS BOARD.**

**INDEPENDENT UNION OF CRAFTSMEN v. SAME.**

Nos. 6974, 7102.

Circuit Court of Appeals, Seventh Circuit.

March 2, 1940.

Herbert Pope, Henry E. Seyfarth, Owen Fairweather, and Lee C. Shaw, all of Chicago, Ill., for Link-Belt Co.

Benjamin Wham and Wham & O'Brien, all of Chicago, Ill., for Independent Union of Craftsmen.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Ruth Weyand, Allen Heald, and Morris P. Glushien, Attys., all of Washington, D. C., for National Labor Relations Board.

Before MAJOR, TREANOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

These cases are here on separate petitions by Link-Belt Company (hereinafter referred to as "employer" or "company") and the Independent Union of Craftsmen (hereinafter referred to as "Independent") to review and set aside, and on request by the National Labor Relations Board (hereinafter referred to as the "Board"), for the enforcement of an order[1] of the Board, issued pursuant to the provisions of § 10 (c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., requiring the employer: (1) to cease and desist (a) from dominating or interfering with the administration of Independent; (b) from discouraging membership in Lodge No. 1604 of Amalgamated Association of Iron, Steel and Tin Workers of North America (hereinafter referred to as "Amalgamated"); (c) from engaging in any manner of espionage or surveillance; (d) from interfering with, restraining, or coercing its employees in the exercise of the right to self-organization guaranteed them by § 7 of the Act. The order further required the employer (2) to take affirmative action (a) withdraw all recognition from Independent as representative of any of its employees at the 39th Street plant, and completely disestablish Independent as such representative; (b) make whole Joseph E. Novak for any loss of pay he may have suffered; (c) offer to certain employees immediate and full reinstatement to their former positions; (d) make them whole for any loss of pay they may have suffered; (e) include certain employees in the seniority list; and post the usual notices signifying compliance with the order.

The proceeding before the Board was instituted by Amalgamated. The amended complaint charged inter alia (1) that the employer instigated, promoted, and encouraged the formation and growth of the In-

dependent, and dominated, interfered with, and contributed support to it; (2) that between September 21, 1936, and December 8, 1937, the employer discharged nine employees because of their union membership and activity, reinstated two of them upon discriminatory conditions, and has refused to reinstate others; (3) that the employer hired Frank Solinko on condition that his father join the Independent; and (4) that the employer used plant operatives for espionage concerning union membership and activity of its employees.

The employer answered, admitting certain of the jurisdictional allegations, but denied it had committed any unfair labor practices.

■ The principal and perhaps the only question presented for our determination is: Are the findings of the Board supported by substantial evidence. If they are, they are conclusive. 49 Stat. 453–455, § 10(e), 29 U.S.C.A. § 160(e); National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299, 300, 59 S.Ct. 501, 83 L.Ed. 660; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126, and National Labor Relations Board v. Waterman Steamship Corp., 60 S.Ct. 493, 84 L.Ed. ——, February 12, 1940.

■ The record discloses that the employer is an Illinois corporation owning and operating numerous plants, warehouses, and sales offices throughout the United States and Canada. At its 39th Street plant in Chicago, Illinois, with which the proceeding is concerned, it employs between 750 and 1,200 persons. This plant includes a complete steel and iron foundry, devoted to the manufacture and assembling of various kinds of machinery. The monthly production at this plant averages 1,100 tons, of which approximately 80 percent is shipped to purchasers outside the State of Illinois. Approximately 90 percent of the raw materials used are bought from outside the State of Illinois. The act is applicable to the company and its employees. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599.

Amalgamated is a labor organization affiliated with the Steel Workers Organization Committee, and through it with the Committee for Industrial Organization.

Independent is an incorporated labor organization whose membership is confined to employees of the employer at the 39th Street plant. The books and records of income and disbursements and cancelled checks were produced at the hearing. It has a checking account at a bank in the city of Chicago. It collects dues of fifty cents per month per member. Over $3,000 has been paid by its members into its treasury in the form of fees and dues and it has paid for the use of a hall and other expenses incidental and necessary to its operation. At least two meetings are held each month.

There was no labor organization in the plant prior to 1933, no unrest over union matters, and the employer-employee relation was friendly. That year, after the passage of the National Industrial Recovery Act, a plan of employee representation was established. It had as its functioning body a board of seven employees, elected by secret ballot. Louis Salmons was one of the seven. The employer participated to the extent of having one non-voting representative. The expenses of the plan were borne by the employer, and it was in existence until April 19, 1937, when it was completely dissolved and abandoned.

In September of 1936 a movement to organize Amalgamated among the employees was commenced by Salmons, and during the period of September, 1936, to April, 1937, a number of the employees joined, largely due to the efforts of Salmons, who upon the employer's premises, during working hours, solicited memberships. In September, 1936, he induced seven of the employees to assist him. These employees held a meeting at which Salmons stated that "no doubt he would be discharged, and in that event it would be up to them to keep the thing going on the inside."

Shortly after Salmons began soliciting for Amalgamated, a growing dissension was noticeable among the employees; the men discussed the merits and demerits of various forms of organization, and the advisability of organizing their own union.

On April 12, 1937, when information was brought to the plant that the National Labor Relations Act had been declared to apply to manufacturing concerns, George F. Linde, an employee, who had never approved of the Employees Representative Plan, and who enjoyed considerable popularity among the employees, together with

Hubert Brucks, John Litster and Arthur H. Rosenbaum, three other employees (none of whom were employed in any supervisory capacity), held a conference and discussed the question of organizing an inside union of employees to bargain collectively through representatives of their own choosing, drafted what they denominated an application, stating that those signing it desired to form an organization within the ranks of the employees. On the following day, this committee interviewed a number of men they believed would be willing to sponsor this form of organization and obtain the signatures of the employees. April 14 the applications were distributed, the employees solicited, and by Friday, April 16, 760 out of approximately 1,000 eligible employees had signed the application. Some of the signatures were obtained during working hours, but the majority were obtained outside of working hours.

On April 17 Linde and Brucks consulted an attorney at law having no connection with the Employees Representative Plan or with the employer. After hearing their case, he advised them concerning the National Labor Relations Act, drew up a proposed constitution and by-laws, and suggested that the employees of the plant hold a general meeting. On Sunday, April 18, Linde and seven other employees held a meeting and made arrangements for the holding of a general meeting of the employees. On Monday, April 19, Linde, Litster, and Ray Frohling, as the organizing committee of Independent, informed Edward L. Berry, Assistant General Manager of the employer, that they (Linde, Litster and Frohling) represented a majority of the employees; that the employees had adopted the name of Independent Union of Craftsmen, and requested that the employer recognize them as the exclusive bargaining representative of the employees at the 39th Street plant. Berry refused, stating he would have to take the matter up with the executive officers of the company.

On Wednesday, April 21, he called this committee into his office and advised them he had been authorized to act for the company. He then asked that he be permitted to inspect the cards evidencing membership in the Independent; after examination thereof, being convinced that they represented a majority of the employees, he recognized the Independent as the collective bargaining agent of the employees. It is well to note here that up to this time the Amalgamated had not made a demand for recognition.

On April 22 a general meeting of the employees was held at the Lithuanian Hall, a public hall rented by the Independent for the occasion, at which were present some 550 employees. Litster presided. Linde was secretary and recorded the proceedings. Wham, attorney for Independent, explained that under the law the employer could in no way interfere, aid, or abet in the formation of a union; that it was entirely up to the employees to decide whom they wished to represent them; that the employer could not contribute anything financially; that the members would have to defray the expenses of the Independent by the payment of dues; and explained the purpose and meaning of the constitution and by-laws. Many questions were asked by those in attendance and finally a motion was made, debated, and carried that the constitution and by-laws be adopted and the actions of the committee ratified.

On May 4, 1937, an election was held at a hall rented for that purpose, at which there were present 400 to 450 employees. Officers of the Independent were elected by secret ballot (none of these officers was a former Employees Plan representative), and the manner of electing shop stewards was agreed upon. The various departments were to hold an election by secret ballot, but not during working hours. Thereafter, 31 stewards were elected.

On May 7, 1937, the employer received a written request from the Independent for a date to begin negotiations with reference to a contract between Independent and the employer, and thereafter, beginning May 11, 1937 up to and including March 3, 1938, collective bargaining conferences were held by representatives of the Independent and the employer. These bargainings resulted in the accomplishment of wage increases, changes in the vacation plan, changes in seniority policy, and improved working conditions.

It was a custom of the employer that Berry hold daily meetings with the supervisory force. In 1936, at one of the meetings, Berry instructed these men to refrain from engaging in union activities, and these instructions were passed on to the foremen.

The record further discloses that both the Amalgamated and the Independent engaged to some extent in union activities on company time (the trial examiner remarking: "I think the record is pretty clear that it worked both ways"), and on September 21, 1936, Salmons and Joseph E. Novak were discharged for engaging in such activity. Salmons admitted union activities, but minimized them on the ground that he did so only when an employee's machine had broken down. He also defended his conduct by stating that he thought the law gave him that right. He was rehired on December 21, 1936, after mediation by a regional director of the National Labor Relations Board, upon the express understanding that he would not again engage in organizing activities inside the plant on company time. Novak was rehired in January, 1937, because, as stated by Berry, "I told him (Novak) that he could have his job back inasmuch as we had put Salmons back, but it was with the distinct understanding that he carry on no unionizing activities on company time."

Based upon the foregoing facts, the Board found that the employer had dominated or interfered with the administration of the Independent, and discouraged membership in the Amalgamated, thereby violating § 8(1) and (2) of the Act. In our opinion the evidence, taken most favorably to the Board, does not furnish substantial support for the Board's findings.

It is true that in National Labor Relations Board v. Newport News, etc., decided December 4, 1939, 60 S.Ct. 203, 84 L. Ed. ——, the Supreme Court of the United States held that where an organization has existed for ten years with a joint control vested in management and men, the effects of the long practice cannot be eliminated and the employees rendered entirely free to act upon their own initiative without the complete disestablishment of the plan, and that their purpose so to do may be obstructed by the existence and recognition by the management of an old plan or organization, the original structure or operation of which was not in accordance with the provisions of the law. It also held that § 10(c) of the Act was not intended to give the Board power of punishment or retribution for past wrongs or errors, and that the men were free to adopt any form of organization and representation, whether purely local or connected with a national body.

In our case, one Lackhouse, an active organizer of the Amalgamated, testified that Berry, General Manager of the company never said anything hostile to the Amalgamated, and the undisputed evidence discloses that the Employees Board was completely dissolved and abandoned prior to the recognition of the Independent; that the company had no voice in the formation and exercised no control in the administration of the Independent; that it gave no financial aid or assistance; and that there was no evidence that the Employees Board was used as an instrument of domination or that the company imposed its will upon its employees.

We believe the language of the court in National Labor Relations Board v. Swank Products, Inc., 3 Cir., 108 F.2d 872, 874, speaking through Judge Biddle, is pertinent and applicable here: "The evidence in this case shows, we think, a genuine, if rare, attempt on the part of the employees to form their own intramural union, to prevent what they considered might be a less advantageous external organization * * *." Cf. National Labor Relations Board v. Brown Paper Mills Company, 108 F.2d 867, Fifth Circuit, and L. Greif & Bro. v. National Labor Relations Board, 4 Cir., 108 F.2d 551.

We are unable to find any evidence from which it could be inferred that these employees did not, with complete independence and freedom from domination, interference, or support of the company, form their own union.

The Board contends that the discharge of Salmons was discriminatory, while on the other hand the company argues that his discharge was due to his activity on behalf of the Amalgamated during working hours. The trial examiner found that in view of Salmons' frank admissions that he had been engaged in union activities on company time, the discharge was not discriminatory. We believe that his finding in this regard should have been sustained by the Board. To find that Salmons' discharge was discriminatory, the Board must have refused to consider the testimony of Edward L. Berry, William A. Conroy, and Joseph Fross that Salmons was discharged for his activity on behalf of the Amalgamated on company time, as well as the admission of Salmons that he had, prior to his discharge, been engaged in union activities on company time.

The point is made that the fact that foreman Siskauskis attended, wtihout participating, the first meeting of the Independent, that foreman Olson had explained to an employee the advantages of an inside union over an outside union, that one Nyberg had another employee to help organize for Independent, and that foreman McKinney had instructed an employee to solicit for Independent, is evidence of unfair labor practices. It is undisputed that Fred B. Skeats was the only person in the foundry who had the power to hire and discharge. Neither of the men involved had that power.

The mere attendance by a foreman at the meeting is not evidence of interference, and the expression by men of a dislike to organized labor does not indicate that they must be acting for the management. National Labor Relations Board v. Swank Products, Inc., supra. We cannot believe that what they did, under all the circumstances in this case, can be charged to the company. Ballston-Stillwater Knitting Co. v. National Labor Relations Board, 2 Cir., 98 F.2d 758, 762; Cupples Co., etc. v. National Labor Relations Board, 8 Cir., 106 F.2d 100, 115.

The Board found that the company had discriminated in regard to the employment of Peter Solinko and the hiring of Frank Solinko. We are unable to give approval to this finding. The evidence does not reasonably support it. The record discloses that Peter had made several requests of Staskey, the company's employment manager, to employ his son Frank and that he was told, at the time of the requests, that the company had no jobs, but that the son might file an application. Later, Frank was hired on April 28, 1937. Peter testified that before Frank was hired, Staskey inquired regarding the strength of the Amalgamated, and then directed Peter to see one Kowatch, an employee; that immediately after this conversation he (Peter) returned to his machine and shortly thereafter Kowatch approached Peter and inquired if Peter desired to join the Independent. Both Staskey and Kowatch denied this conversation, and Frank Solinko testified that Staskey had, about two months prior to April 28, asked his father "how strong the Amalgamated was" and that after this remark Frank filled out an application, but that Staskey had not, on April 28, talked to him about unions.

Peter was laid off on January 5, 1938, because of a lack of orders. Frank was not laid off and was at the time of the hearing still in the employ of the company. They were both members of the Amalgamated and the Independent. Even if the testimony of Peter was true, it is to be noted that the conversation that he relates occurred two months prior to the day Frank was hired. Moreover, if it is claimed that it took place on the day Frank was hired, then it was after the Independent had been recognized by the company as the bargaining agent of the employees: No inference unfavorable to the company can be reasonably drawn from these facts. We conclude that the finding of the Board in this regard is contrary to the evidence.

On the question of espionage the record discloses that the company had been a member of the National Metal Trades Association, and that from 1915 until October, 1936, one James Cousland, a lathe operator, employed by the company, made monthly reports to the National Metal Trades Association, copies of which were sent to the company. In January, 1937, Cousland joined the Amalgamated, resigning in May after it had become known that he was in the employ of the Trades Association. He became a member of the Independent in June or July of 1937. Cousland testified that his reports dealt with matters of safety, sanitation, production, and with dissatisfaction voiced by employees relative to piece work rates. These reports made by Cousland were copied by the Trades Association, the copies sent to the company, and the originals destroyed. The company destroyed the copies as soon as they were read. We think that the facts and circumstances in evidence, particularly the secrecy veiling Cousland's reports, the circuitous routing and the immediate destroying of the reports, furnish substantial basis for the finding that the company has thereby engaged in unfair labor practices.

We now discuss that part of the order requiring the company to make whole to Joseph E. Novak, John Kalamarie, Mike Karbol, and Nick Cumorich any loss of pay they may have suffered by reason of their discharge; and to offer Kalamarie, Karbol, and Cumorich full reinstatement to their former positions, without prejudice to their seniority and other rights.

Novak had been employed for eleven years. He was accused of engaging

in union activity on company time. He denied the accusation. There was no competent evidence tending to prove the accusation. He was discharged on September 21, 1937 and rehired in January, 1938. Under the circumstances, we are of the opinion that the order of the Board, that Novak be made whole for any loss of pay, should be enforced.

Mike Karbol entered the employ of the company in 1925 and remained until 1932, when he was laid off for lack of work. He was rehired in March of 1937 and discharged on May 19, 1937. There was no evidence that he was an active member or that the employer ever knew that he was a member of the Amalgamated.

Nick Cumorich entered the employ of the company in December, 1936, as a laborer in the foundry, and was discharged on May 19, 1937. He became a member of the Amalgamated in April of 1937. Here too there was no evidence that Cumorich was active in the Amalgamated, that he wore an Amalgamated button, or that the employer had any knowledge that he was a member of the Amalgamated. Both Karbol and Cumorich testified that an employee had asked them to join the Independent.

The Board found that Karbol and Cumorich were discharged because they had joined the Amalgamated. The company contends that these employees were discharged for inefficiency. There was evidence to the effect that the costs in the department in which they were employed were rising; that an examination of the time cards, when compared with other men and rechecked by a chart used in other foundries, showed that Karbol exceeded the time allowed for the work by 37% and Cumorich by 47%.

The National Labor Relations Act does not interfere with the normal right of the employer to discharge his employees. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 46, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Thompson Products, 6 Cir., 97 F.2d 13, 17. We conclude that the findings of the Board as to the discriminatory discharges of Karbol and Cumorich are not sustained by substantial evidence.

John Kalamarie was hired on November 11, 1935, as a laborer, and in 1936 he was promoted to the job of a burner in the steel cleaning or shipping room, cutting off metallic imperfections, occasionally cutting scrap metal to facilitate remelting. In August, 1937, he became an arc welder, and was engaged in that work at the time he was laid off on November 30, 1937. In March, 1937, he joined and became an active member of the Amalgamated, was a member of a grievance committee, and attended a conference between the committee and General Manager Berry on November 18, 1937.

The Board found that Kalamarie was discharged because of his union membership and activities. At the hearing before the trial examiner the company contended that Kalamarie's layoff was due to a business slump. It is undisputed that in October, 1937, the company's business was reduced sharply. Of 283 employees in the foundry, 100 were laid off during a period of five months beginning in November. The output of the foundry dropped from 794 tons in March to 448 tons in November, 1937, and the company was forced to reduce the number of its employees. But the Board now contends that Kalamarie should have been transferred to his old job as a burner, since he had a longer "plant seniority" than one Thiele, a burner who was not laid off until January 5, 1938.

The company employed four welders. One C. Novak and Kalamarie were arc welders, and the other two were combination welders, qualified to work either at arc or gas welding. Novak, having less seniority, was laid off November 29, 1937. Deskus, a combination welder, was retained. There was need for two gas welders until January 5, 1938, when he too was laid off.

To accede to the Board's contention would oblige the company to transfer employees from occupations they held at the time of a layoff to jobs they formerly held. It was the company's policy to recognize seniority "within the occupation." To approve the finding that the company had discriminated against Kalamarie because it did not procure for him a job in another occupation, it seems to us, would be to hold that the Board has managerial authority of the employer's business. The Board has no such power. National Labor Relations Board v. Union Pacific Stage, Inc., 9 Cir., 99 F.2d 153, 177.

There appears to be no controversy regarding that part of the order requiring the company to include Paul Bozurich, Harry Johnson and Stanley Balcauskis in the seniority list by classification, and refrain from discriminating against them when, in accordance with its usual seniority rules, employment becomes available; as neither party discusses it, we assume therefore that the company acquiesces in its enforcement.

It follows from what we have said that the order of the Board will be modified in accordance with this opinion, and, as thus modified and construed, the order of the Board is enforced.

TREANOR, Circuit Judge (concurring in part and dissenting in part).

I agree with the majority's holding respecting the Board's finding of discrimination against Joseph E. Novak and John Kalamarie, and with the conclusion that there was substantial evidence to support the Board's finding that petitioner engaged in industrial espionage in violation of Section 8 (1) of the National Labor Relations Act.

But I am of the opinion, also, that there was substantial evidence to support the Board's finding that the petitioner, Link-Belt Company, interfered with and supported the Independent in violation of Section 8 (1) (2) of the National Labor Relations Act, and to support the findings relating to employees Salmons, Peter and Frank Solinko, and Karbol and Cumorich.

Since the circumstances attending the discharge of Salmons and Novak bear on the attitude of petitioner toward union activities I shall refer to both, although the majority upholds the finding of the Board respecting Novak's discharge. Salmons had been active in the old employees' representative plan, but in September, 1936, was endeavoring to secure members for the Union. His activities became known to the plant manager and on September 21 Salmons and Novak were separately discharged. Salmons testified that the manager accused him of "spreading Union propaganda"; and that in response to Salmons' remark that there was "talk of it" the manager replied that he did not want to argue with Salmons and told him that he would give him "half an hour to get out of the plant." Novak testified that the manager stated that he understood that Novak was "an organizer and instigator for a Union." Novak denied to the manager that he was an organizer or an instigator and was told by the manager that he would give him "half an hour to get out." According to Novak's testimony the manager also stated that he didn't want Novak around if he was "organizing or instigating a Union."

The trial examiner found that the discharge of Salmons was not discriminatory, and if the question before this court were whether, as between the trial examiner and the Labor Relations Board, there was sufficient evidence to sustain the trial examiner's finding, I should have no difficulty in saying that there was. But under the National Labor Relations Act we do not review the findings of the examiner but the findings of the Board. In view of the conflicting evidence and the necessity of appraising credibility and probative force of testimony it is obvious that the Board reasonably could have found that the discharge was not discriminatory, if it had resolved certain of the conflicts in favor of petitioner and had given less credence than it obviously did to the testimony of some of the witnesses. I do not think it follows, as stated in the majority opinion, that "to find that Salmons' discharge was discriminatory, the Board must have refused to consider the testimony of Edward L. Berry, William A. Conroy, and Joseph Fross that Salmons was discharged for his activity on behalf of the Amalgamated on company time, as well as the admission of Salmons that he had, prior to his discharge, been engaged in union activities on company time." The admission of Salmons that he had been engaged in union activities on company time must be considered in connection with evidence which clearly established that supporters both of the Union and of the Independent engaged in activities on company time. There is evidence that the supporters of the Independent were much more active on company time than Salmons and other supporters of the Union; and there was testimony from which the Board reasonably could have inferred that such activities were known to petitioner. The testimony of Novak and Salmons in respect to their conversations with the manager of respondent at the time of their discharges clearly is susceptible of the inference that they were being discharged because of their activities on behalf of the Union. Consequently, instead of our concluding that the Board refused to consider

the testimony of the named persons, we must assume that the Board gave more credence to the testimony of Salmons and Novak, doubtless considering in connection therewith circumstances that indicated definite and strong opposition of the management to the Union. Since we are bound to resolve all conflicts in testimony in favor of the finding of the Board and to accept as true all testimony tending to support it and to disregard all adverse testimony, I find myself unable to say that the finding of the Board in respect to the discharges of Salmons and Novak was not supported by substantial evidence.

In respect to the finding that respondent had discriminated in the employment of Peter Solinko and the hiring of Frank Solinko the record reveals clear-cut conflicts of testimony. Resolving the conflicts in favor of the finding of the Board I think there is substantial evidence to support the finding. The Board did not order any affirmative relief in respect to the discrimination in favor of the Solinkos but considered this as constituting encouragement of membership in the Independent and discouraging membership in the Union, and therefore treated the finding as supporting the cease and desist order.

The testimony respecting the discharges of Karbol and Cumorich presents sharp conflicts of evidence; and the determination of the cause of discharge requires evaluation of certain evidence bearing on the efficiency of these men. There is testimony in the record that the day foreman, McKinney, solicited the employees of the night shift for membership in the Independent, Karbol and Cumorich being members of the night shift. They refused to join and later became members of the Union in the latter part of April, 1937. On May 19, 1937, both men were discharged by the night boss, Belov, upon orders from foreman McKinney. Both Karbol and Cumorich testified that Belov, at the time of their discharge, stated that they were good workmen and that he did not know the reason for their discharge. The discharged men also testified that no one ever had warned them in respect to their work or criticized their work prior to their discharge. McKinney testified that he had repeatedly warned both men that their work was unsatisfactory and also testified that he had instructed one Peters to check the labor cards of Karbol and Cumorich and that these studies confirmed his judgment as to their inefficiency. Peters testified that he thought he made the check sometime in May, 1937. The Board points out certain qualifying defects in the studies which lessen their value.

The specific question for us is whether there was substantial evidence to support the finding of the Board that the men were discharged because of their union activities. Disregarding the evidence of inefficiency, it is clear that there was substantial evidence from which the Board could conclude that the men were discharged because of their union activities. The inconclusive character of the evidence of inefficiency left the Board some margin of discretion.

In National Labor Relations Board v. Waterman Steamship Corp., Feb. 12, 1940, 60 S.Ct. 493, 496, 84 L.Ed. ——, the Supreme Court pointed out that in setting up the National Labor Relations Board Congress "left questions of law which arise before the Board—but not more—ultimately to the traditional review of the judiciary"; and that, in respect to administrative agencies, "not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies." The Supreme Court also pointed out that "The Court of Appeals' failure to enforce the Board's order resulted from the substitution of its judgment on disputed facts for the Board's judgment," and added that "power to do that has been denied the courts by Congress." It is equally true that a Court of Appeals cannot substitute its judgment as to weight and credibility of testimony for that of the Board; and a Circuit Court of Appeals must give effect to all reasonable inferences in favor of the Board's findings of fact and disregard all evidence contrary thereto. This is not a new or startling doctrine. Many persons are serving terms in prison, and many have suffered the death penalty as a result of jury verdicts which rested upon evidence which involved irreconcilable conflicts of testimony and very serious questions of credibility and weight of evidence. In many such cases the issue of guilt or innocence has turned upon the jury's appraisal of conflicting testimony, of circumstantial evidence, and of the weight and credibility of testimony. When an appeal is taken from the judgment of a trial court, a finding of fact, whether by the jury or the trial court,

cannot be disturbed by the reviewing court if there is substantial evidence to support it. No doubt our confidence in the training and experience of the trial judge eases any apprehension that we may feel by reason of our inability to appreciate clearly the considerations which have moved the jury or the trial judge in resolving conflicts of evidence against a losing party, or in attributing higher credibility and greater weight to the testimony of some witnesses than to others. And, no doubt, the rule of law which requires us to accept findings of triers of fact in judicial proceedings is justified, in part at least, by the assumption that the soundness of the findings is guaranteed by the competency of the trial judge. But, as pointed out in National Labor Relations Board v. Waterman, supra, it was the intention of Congress, by the creation of the National Labor Relations Board, "to apply an orderly, informed and specialized procedure to the complex, administrative problems arising in the solution of industrial disputes;" and in its opinion the court stated that "not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies." Whether the assumed specialized and expert knowledge and experience of the personnel of an administrative agency afford sufficient guarantee of the dependability of the agency's fact finding is a question of policy for Congress to settle, and this court can exercise only such jurisdiction in respect to the fact finding function as Congress chooses to confer upon it. If there is no substantial evidence, that is, no evidence of a "rational probative force," to support a particular finding of fact, then such a finding is arbitrary and, as a matter of law, cannot be accepted as the basis of any legal consequences. And under the decisions of the Supreme Court of the United States this is the only question related to fact finding over which a Circuit Court of Appeals has any jurisdiction under the National Labor Relations Act.

I am of the opinion that there was substantial evidence to support a finding by the Board that the petitioner-employer engaged in unfair labor practices in violation of Section 8 (1) (2) by interfering with the formation of the Independent. But I find no substantial evidence to show that such activities decisively influenced the formation of the Independent or continued to influence its administration after its organization. Consequently, I believe that the order requiring petitioner to withdraw all recognition from the Independent and to refuse to recognize it as the bargaining agent of the employees should not be enforced.

The Independent was organized in April, 1937, and the Board issued a complaint and notice of hearing on March 4, 1938. The hearing was held from March 4 to March 23, 1938, and on May 9, 1938, the trial examiner filed his intermediate report. On May 12, 1939, the Board rendered its decision, which was approximately two years after the organization of the Independent and after the acts and occurrences upon which the proceedings were based. All the evidence respecting the administration of the affairs of the Independent during the two years prior to the hearing before the Board reasonably precludes any inference of fact that it was not a bona fide labor union in the strictest sense. It is true that it was not affiliated with a national labor organization but that is immaterial under the National Labor Relations Act.

At the time of the organization of the Independent there were between 950 and 1,000 who were eligible for membership and approximately 760 had signed applications for membership in the Independent. The Independent was incorporated in 1937 under the laws of the State of Illinois, keeps minute books and account books, and the books and records, including its minutes and the records of income and disbursements were introduced in evidence and were regular in every respect. It maintains a checking account, collects dues, and over $3,000 had been collected by the Independent from its members in the form of fees and dues at the time of the hearing. It is unquestioned that all of the cost of administration of the Independent has been paid out of its own funds. It has rented and paid for the use of a hall and all meetings are held off company property. In the initial stages of organization it employed its attorney and has paid for his services out of its funds. It has carried on extensive collective bargaining with the company and I am unable to find anything in the form or in the character of the bargaining transactions which can be said reasonably to justify an inference that in its bargaining activities the Independent is in any sense controlled in its freedom of action by the company.

The Board states as one of its findings the following: "We find that the respondent has dominated and interfered with the formation and administration of the Independent, and has contributed support to it; that it thereby has interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act." And under the heading "The Remedy" is the following recital: We have found that the respondent has dominated and interfered with the formation and administration of the Independent and has contributed support to it. The respondent's acts render the Independent incapable of serving the respondent's employees as a genuine bargaining representative and render its continued recognition by the respondent an obstacle to collective bargaining through freely chosen representatives. We shall, accordingly, order the respondent to withdraw all recognition from the Independent, and to disestablish it as a representative of the employees of the 39th Street plant for the purposes of collective bargaining."

It appears from the foregoing recitals from the decision of the Labor Board that the Board did not make an explicit finding that the petitioner was continuing to dominate and interfere with the administration of the Independent at the time of the hearing. In National Labor Relations Board v. Newport News, December 4, 1939, 60 S.Ct. 203, 205, 84 L.Ed. —, the opinion of the Supreme Court discloses that the order of disestablishment was based upon the finding that the employer "was still dominating and interfering with the Committee, contrary to Sec. 8 (1) of the Act [29 U.S.C.A. § 158]." The Supreme Court stated that on the record it could not say that it was error for the Board to hold "that, where an organization has existed for ten years and has functioned in the way that the Committee has functioned, with a joint control vested in management and men, the effects of the long practice cannot be eliminated and the employees rendered entirely free to act upon their own initiative without the complete disestablishment of the plan." But in the instant case there is no such factual situation. The evidence of domination or interference at the inception of the organization of the Independent indicates, at the most, a relatively unimportant influence in view of the obvious enthusiasm of an overwhelming majority of the employees for the organization of the Independent. Furthermore, in contrast to the situation in the Newport News case and in National Labor Board v. Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 576, 82 L.Ed. 831, 115 A.L.R. 307, there is no substantial evidence to support an inference of continued interference for any appreciable time subsequent to the organization of the Independent. In the Greyhound Lines case the Supreme Court stated that "we may assume that there are situations in which the Board would not be warranted in concluding that there was any occasion for withdrawal of employer recognition of an existing union before an election by employees under section 9 (c), 29 U.S.C.A. § 159(c), even though it had ordered the employer to cease unfair labor practices." But the court added that in the case before it the employers, by unfair labor practices, had "succeeded in establishing a company union so organized that it [was] incapable of functioning as a bargaining representative of employees."

Under the decisions the National Labor Relations Board may predicate a cease and desist order upon a finding that an employer has committed unfair labor practices, despite a showing that the objectionable practices have ceased prior to the hearing. But an order to withdraw recognition of an existing bargaining agency and to disestablish it as the representative of employees as their bargaining agent affords affirmative relief from an existing condition or situation. Such an order effectuates the policy of the act by ending what purports to be a collective bargaining arrangement but which, in fact, "is incapable of functioning as a bargaining representative of employees," (Greyhound Lines case, supra) or, at least, is an obstacle to collective bargaining through freely chosen representatives. And it follows from the nature and function of an order of disestablishment of a bargaining agent that the policy of the act will not be effectuated by such an order if the agency disestablished thereby is actually the free choice of a majority of the members of the bargaining unit and is genuinely free to represent the interests of the employees in their relation to the employer. Under such circumstances, an order of disestablishment would frustrate, not effectuate, the policy of the act.

Since I believe there was no substantial evidence to support the Board's conclusion that petitioner's acts either rendered

the Independent incapable of serving petitioner's employees as a genuine bargaining representative, or rendered its continued recognition by petitioner an obstacle to collective bargaining through freely chosen representatives, I conclude that the disestablishment portion of the Board's order was invalid.