## NATIONAL LABOR RELATIONS BOARD v. FAN-STEEL METALLURGICAL CORP.

No. 436. Argued January 12, 13, 1939.—Decided February 27, 1939.

*Mr. Charles Fahy,* with whom *Solicitor General Jackson,* and *Messrs. Charles A. Horsky, Robert B. Watts, Laurence A. Knapp,* and *Mortimer B. Wolf,* and *Ruth Weyand* were on the brief, for petitioner.

*Mr. Max Swiren,* with whom *Messrs. Benjamin V. Becker* and *Sidney H. Block* were on the brief, for respondent.

Mr. Chief Justice Hughes delivered the opinion of the Court.

The Circuit Court of Appeals set aside an order of the National Labor Relations Board requiring respondent to desist from labor practices found to be in violation of the National Labor Relations Act and to offer reinstatement to certain discharged employees with back pay. While the other portions of the Board's order are under review, the principal question presented relates to the authority of the Board to require respondent to reinstate employees who were discharged because of their unlawful conduct in seizing respondent's property in what is called a "sit-down strike."

Respondent, Fansteel Metallurgical Corporation, is engaged at North Chicago, Illinois, in the manufacture and sale of products made from rare metals. No question is raised as to the intimate relation of its operations to interstate commerce or the effect upon that commerce of the unfair labor practices with which the corporation is charged. The findings of the Board show that in the summer of 1936 a group of employees organized Lodge 66 under the auspices of a committee of the Amalgamated Association of Iron, Steel and Tin Workers of North America; that respondent employed a "labor spy" to engage in espionage within the Union and his employment was continued until about December 1, 1936; that on September 10, 1936, respondent's superintendent was requested to meet with a committee of the Union and the superintendent required that the committee should con-

sist only of employees of five years' standing; that a committee, so constituted, presented a contract relating to working conditions; that the superintendent objected to "closed-shop and check-off provisions" and announced that it was respondent's policy to refuse recognition to "outside" unions; that on September 21, 1936, the superintendent refused to confer with the committee in which an "outside" organizer had been included; that meanwhile, and later, respondent's representatives sought to have a "company union" set up, but the attempt proved abortive; that from November, 1936, to January, 1937, the superintendent required the president of the Union to work in a room adjoining the superintendent's office with the purpose of keeping him away from the other workers; that while in September, 1936, the Union did not have a majority of the production and maintenance employees, an appropriate unit for collective bargaining, by February 17, 1937, 155 of respondent's 229 employees in that unit had joined the Union and had designated it as their collective bargaining representative; that on that date, a committee of the Union met twice with the superintendent, who refused to bargain with the Union as to rates of pay, hours and conditions of employment, the refusal being upon the ground that respondent would not deal with an "outside" union.

Shortly after the second meeting in the afternoon of February 17th the Union committee decided upon a "sit-down strike" by taking over and holding two of respondent's "key" buildings. These were thereupon occupied by about 95 employees. Work stopped and the remainder of the plant also ceased operations. Employees who did not desire to participate were permitted to leave, and a number of Union members who were on the night shift and did not arrive for work until after the seizure did not join their fellow members inside the buildings. At about six o'clock in the evening the superintendent,

accompanied by police officials and respondent's counsel, went to each of the buildings and demanded that the men leave. They refused, and respondent's counsel "thereupon announced in loud tones that all the men in the plant were discharged for the seizure and retention of the buildings." The men continued to occupy the buildings until February 26, 1937. Their fellow members brought them food, blankets, stoves, cigarettes and other supplies.

On February 18th, respondent obtained from the state court an injunction order requiring the men to surrender the premises. The men refused to obey the order and a writ of attachment for contempt was served on February 19th. Upon the men's refusal to submit, a pitched battle ensued and the men successfully resisted the attempt by the sheriff to evict and arrest them. Efforts at mediation on the part of the United States Department of Labor and the Governor of Illinois proved unavailing. On February 26th the sheriff with an increased force of deputies made a further attempt and this time, after another battle, the men were ousted and placed under arrest. Most of them were eventually fined and given jail sentences for violating the injunction.

Respondent on regaining possession undertook to resume operations, and production gradually began. By March 12th the restaffing was approximately complete. A large number of the strikers, including many who had participated in the occupation of the buildings, were individually solicited to return to work with back pay but without recognition of the Union. Some accepted the offer and were reinstated; others refused to return unless there were union recognition and mass reinstatement, and were still out at the time of the hearing before the Board. New men were hired to fill the positions of those remaining on strike.

Meanwhile the Union was not inactive. On March 3d and 5th there were requests, which respondent refused,

for meetings to consider the recognition of the Union for collective bargaining. There was no collective request for reinstatement of all the strikers. The position of practically all the strikers who did not go back, and who were named in the complaint filed with the Board, was "that they were determined to stay out until the Union reached a settlement with the respondent."

Early in April a labor organization known as Rare Metal Workers of America, Local No. 1, was organized among respondent's employees. There was a meeting in one of respondent's buildings on April 15th, which was attended by about 200 employees, and the balloting resulted in a vote of 185 to 15 in favor of the formation of an "independent" organization. Another meeting was held soon after for the election of officers. Respondent accorded these efforts various forms of support. The Board concluded that the Rare Metal Workers of America, Local No. 1, was the result of the respondent's "antiunion campaign" and that respondent had dominated and interfered with its formation and administration.

Upon the basis of these findings and its conclusions of law, the Board made its order directing respondent to desist from interfering with its employees in the exercise of their right to self-organization and to bargain collectively through representatives of their own choosing as guaranteed in § 7 of the Act; from dominating or interfering with the formation or administration of the Rare Metal Workers of America, Local No. 1, or any other labor organization of its employees or contributing support thereto; and from refusing to bargain collectively with the Amalgamated Association of Iron, Steel and Tin Workers of North America, Lodge 66, as the exclusive representative of the employees described. The Board also ordered the following affirmative action which it was found would "effectuate the policies" of the Act;—that is, upon request, to bargain collectively with the Amal-

gamated Association as stated above; to offer, upon application, to the employees who went on strike on February 17, 1937, and thereafter, "immediate and full reinstatement to their former positions," with back pay, dismissing, if necessary, all persons hired since that date; to withdraw all recognition from Rare Metal Workers of America, Local No. 1, as a representative of the employees for the purpose of dealing with respondent as to labor questions, and to "completely disestablish" that organization as such representative; and to post notices of compliance. 5 N. L. R. B. 930.

The Board found that respondent had not engaged in unfair labor practices by "discrimination in regard to hire or tenure of employment" in order to "encourage or discourage membership in any labor organization," and accordingly the complaint under § 8 (3) of the Act was dismissed. *Id.*

On respondent's petition, the Circuit Court of Appeals set aside the Board's order, 98 F. 2d 375, and this Court granted certiorari, 305 U. S. 590.

*First. The unfair labor practices.*—The Board concluded that by "the anti-union statements and actions" of the superintendent on September 10, 1936, and September 21, 1936, by "the campaign to introduce into the plant a company union," by "the isolation of the Union president from contact with his fellow employees," and by the employment and use of a "labor spy," respondent had interfered with its employees, and restrained and coerced them, in the exercise of their right to self-organization guaranteed in § 7 of the Act, and thus had engaged in an unfair labor practice under § 8· (1) of the Act.

Owing to the fact that in September, 1936, the Union did not have a majority of the employees in the appropriate unit, the Board held that it was precluded from finding unfair labor practices in refusing to bargain collectively at that time, but the Board found that there

was such a refusal on February 17, 1937, when the Union did have a majority of the employees in the appropriate unit, and that this constituted a violation of § 8 (5).

These conclusions are supported by the findings of the Board and the latter in this relation have substantial support in the evidence.

*Second. The discharge of the employees for illegal conduct in seizing and holding respondent's buildings.*— The Board does not now contend that there was not a real discharge on February 17th when the men refused to surrender possession. The discharge was clearly proved.

Nor is there any basis for dispute as to the cause of the discharge. Representatives of respondent demanded that the men leave, and on their refusal announced that they were discharged "for the seizure and retention of the buildings." The fact that it was a general announcement applicable to all the men in the plant who thus refused to leave does not detract from the effect of the discharge either in fact or in law.

Nor is it questioned that the seizure and retention of respondent's property were unlawful. It was a high-handed proceeding without shadow of legal right. It became the subject of denunciation by the state court under the state law, resulting in fines and jail sentences for defiance of the court's order to vacate and in a final decree for respondent as the complainant in the injunction suit.

This conduct on the part of the employees manifestly gave good cause for their discharge unless the National Labor Relations Act abrogates the right of the employer to refuse to retain in his employ those who illegally take and hold possession of his property.

*Third. The authority of the Board to require the reinstatement of the employees thus discharged.*—The contentions of the Board in substance are these: (1) That

the unfair labor practices of respondent led to the strike and thus furnished ground for requiring the reinstatement of the strikers; (2) That under the terms of the Act employees who go on strike because of an unfair labor practice retain their status as employees and are to be considered as such despite discharge for illegal conduct; (3) That the Board was entitled to order reinstatement or reëmployment in order to "effectuate the policies" of the Act.

(1) For the unfair labor practices of respondent the Act provided a remedy. Interference in the summer and fall of 1936 with the right of self-organization could at once have been the subject of complaint to the Board. The same remedy was available to the employees when collective bargaining was refused on February 17, 1937. But reprehensible as was that conduct of the respondent, there is no ground for saying that it made respondent an outlaw or deprived it of its legal rights to the possession and protection of its property. The employees had the right to strike but they had no license to commit acts of violence or to seize their employer's plant. We may put on one side the contested questions as to the circumstances and extent of injury to the plant and its contents in the efforts of the men to resist eviction. The seizure and holding of the buildings was itself a wrong apart from any acts of sabotage. But in its legal aspect the ousting of the owner from lawful possession is not essentially different from an assault upon the officers of an employing company, or the seizure and conversion of its goods, or the despoiling of its property or other unlawful acts in order to force compliance with demands. To justify such conduct because of the existence of a labor dispute or of an unfair labor practice would be to put a premium on resort to force instead of legal remedies and to subvert the principles of law and order which lie at the foundations of society.

As respondent's unfair labor practices afforded no excuse for the seizure and holding of its buildings, respondent had its normal rights of redress. Those rights, in their most obvious scope, included the right to discharge the wrongdoers from its employ. To say that respondent could resort to the state court to recover damages or to procure punishment, but was powerless to discharge those responsible for the unlawful seizure would be to create an anomalous distinction for which there is no warrant unless it can be found in the terms of the National Labor Relations Act. We turn to the provisions which the Board invokes.

(2) In construing the Act in *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 45, 46, we said that it "does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them"; that the employer "may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion." See, also, *Associated Press* v. *National Labor Relations Board,* 301 U. S. 103, 132. Compare *Texas & New Orleans R. Co.* v. *Brotherhood,* 281 U. S. 548, 571; *Virginian Railway Co.* v. *System Federation No. 40,* 300 U. S. 515, 559.

It is apparent under that construction of the Act that had there been no strike, and employees had been guilty of unlawful conduct in seizing or committing depredations upon the property of their employer, that conduct would have been good reason for discharge, as discharge on that ground would not be for the purpose of intimidating or coercing employees with respect to their right of self-organization or representation, or because of any lawful

union activity, but would rest upon an independent and adequate basis.

But the Board, in exercising its authority under § 10 (c) to reinstate *"employees,"* insists that here the status of the employees was continued, despite discharge for unlawful conduct, by virtue of the definition of the term *"employee"* in § 2. (3). By that definition the term includes

"any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, : . ."

We think that the argument misconstrues the statute. We are unable to conclude that Congress intended to compel employers to retain persons in their employ regardless of their unlawful conduct,—to invest those who go on strike with an immunity from discharge for acts of trespass or violence against the employer's property, which they would not have enjoyed had they remained at work. Apart from the question of the constitutional validity of an enactment of that sort, it is enough to say that such a legislative intention should be found in some definite and unmistakable expression. We find no such expression in the cited provision.

We think that the true purpose of Congress is reasonably clear. Congress was intent upon the protection of the right of employees to self-organization and to the selection of representatives of their own choosing for collective bargaining without restraint or coercion. *National Labor Relations Board* v. *Jones & Laughlin Steel Corp., supra,* p. 33. To assure that protection, the employer is not permitted to discharge his employees because of union activity or agitation for collective bargaining. *Associated Press* v. *National Labor Relations Board, supra.* The conduct thus protected is lawful conduct.

Congress also recognized the right to strike,—that the employees could lawfully cease work at their own volition because of the failure of the employer to meet their demands. Section 13 provides that nothing in the Act "shall be construed so as to interfere with or impede or diminish in any way the right to strike." But this recognition of "the right to strike" plainly contemplates a lawful strike,—the exercise of the unquestioned right to quit work. As we said in *National Labor Relations Board v. Mackay Radio & Telegraph Co.*, 304 U. S. 333, 347, "if men strike in connection with a current labor dispute their action is not to be construed as a renunciation of the employment relation and they remain employees for the remedial purposes specified in the Act." There is thus abundant opportunity for the operation of § 2 (3) without construing it as countenancing lawlessness or as intended to support employees in acts of violence against the employer's property by making it impossible for the employer to terminate the relation upon that independent ground.

Here the strike was illegal in its inception and prosecution. As the Board found, it was initiated by the decision of the Union committee "to take over and hold two of the respondent's 'key' buildings." It was pursuant to that decision that the men occupied the buildings and the work stopped. This was not the exercise of "the right to strike" to which the Act referred. It was not a mere quitting of work and statement of grievances in the exercise of pressure recognized as lawful. It was an illegal seizure of the buildings in order to prevent their use by the employer in a lawful manner and thus by acts of force and violence to compel the employer to submit. When the employees resorted to that sort of compulsion they took a position outside the protection of the statute and accepted the risk of the termination of their employment

upon grounds aside from the exercise of the legal rights which the statute was designed to conserve.

(3) The Board contends that its order is valid under the terms of the Act "regardless of whether the men remained employees." The Board bases its contention on the general authority, conferred by § 10 (c), to require the employer to take such affirmative action as will "effectuate the policies" of the Act. Such action, it is argued, may embrace not only reinstatement of those whose status as employees has been continued by virtue of § 2 (3), but also a requirement of the "reëmployment" of those who have ceased to be employed.

The authority to require affirmative action to "effectuate the policies" of the Act is broad but it is not unlimited. It has the essential limitations which inhere in the very policies of the Act which the Board invokes. Thus in *Consolidated Edison Co. v. National Labor Relations Board*, 305 U. S. 197, we held that the authority to order affirmative action did not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices, even though the Board is of the opinion that the policies of the Act may be effectuated by such an order. We held that the power to command affirmative action is remedial, not punitive, and is to be exercised in aid of the Board's authority to restrain violations and as a means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the Act.

We repeat that the fundamental policy of the Act is to safeguard the rights of self-organization and collective bargaining, and thus by the promotion of industrial peace to remove obstructions to the free flow of commerce as defined in the Act. There is not a line in the statute to warrant the conclusion that it is any part of the policies

of the Act to encourage employees to resort to force and violence in defiance of the law of the land. On the contrary, the purpose of the Act is to promote peaceful settlements of disputes by providing legal remedies for the invasion of the employees' rights. Elections may be ordered to decide what representatives are desired by the majority of employees in appropriate units as determined by the Board. To secure the prevention of unfair labor practices by employers, complaints may be filed and heard and orders made. The affirmative action that is authorized is to make these remedies effective in the redress of the employees' rights, to assure them self-organization and freedom in representation, not to license them to commit tortious acts or to protect them from the appropriate consequences of unlawful conduct. We are of the opinion that to provide for the reinstatement or reëmployment of employees guilty of the acts which the Board finds to have been committed in this instance would not only not effectuate any policy of the Act but would directly tend to make abortive its plan for peaceable procedure.

What we have said also meets the point that the question whether reinstatement or reëmployment would effectuate the policies of the Act is committed to the decision of the Board in the exercise of its discretion subject only to the limitation that its action may not be "arbitrary, unreasonable or capricious." The Board recognizes that in "many situations" reinstatement or reëmployment after discharge for illegal acts would not be proper, but the Board insists that it was proper in this instance. For the reasons we have given we disagree with that view. We think that a clearer case could hardly be presented and that, whatever discretion may be deemed to be committed to the Board, its limits were transcended by the order under review.

The Board stresses the fact that, when respondent was able to obtain possession of its buildings and to resume operations, it offered reëmployment to many of the men who had participated in the strike. The contention confuses what an employer may voluntarily and legally do in the exercise of his right of selection and what the Board is entitled to compel. In announcing the reopening respondent stated its belief that a large number of men who had taken part in the seizure of the plant were compelled to do so through coercion and intimidation and that applications for reëmployment from such men would receive favorable consideration. The Board challenges the statement that respondent limited its rehiring to such applicants. The Board points to evidence showing that everyone who applied for reëmployment during the period of restaffing was taken back without condition except two employees who were advanced in years and were not reinstated solely for that reason, and to the testimony of the superintendent that at least thirty-seven were rehired "who had been in the sit-down."

We find it unnecessary to consider in detail the respective contentions as to respondent's offer of reëmployment, for we think that its action did not alter the unlawful character of the strike or respondent's rights in that aspect. The important point is that respondent stood absolved by the conduct of those engaged in the "sit-down" from any duty to reëmploy them, but respondent was nevertheless free to consider the exigencies of its business and to offer reëmployment if it chose. In so doing it was simply exercising its normal right to select its employees.

*Fourth. The requirement of reinstatement of employees who aided and abetted those who seized and held the buildings.*—There is a group of fourteen persons in this class who were not within the buildings and hence do not appear to have been within the announcement of dis-

charge, but who went on strike and fall within the order for reinstatement. The Board made no separate findings with respect to these particular persons and refers us to the evidence to show their relation to the transactions under review. This, however, sufficiently appears in the stipulation of facts, to which the Board was a party, naming in paragraph 12 these fourteen persons and describing their conduct as follows:

"All of the following men were employees of the company on February 17, 1937, but did not participate in the seizure and retention of the building, but aided and abetted the men within the said buildings 3 and 5 in the retention of the said buildings by soliciting, procuring and delivering of food, bedding, cigarettes, stoves, or other supplies, or in some other manner, and thereby assisted the said men in buildings 3 and 5 to remain therein contrary to the injunctional order and writ of injunction heretofore mentioned; that all of the said men named in this paragraph had actual knowledge of the issuance of the said injunctional order and writ of injunction ordering and directing the men in buildings 3 and 5 to vacate the same, and that their activities in aiding and abetting the men in buildings 3 and 5 were done with a view to and for the purpose of assisting the said men to remain in the said buildings after the issuance of the said injunctional order and writ of injunction and with knowledge thereof. None of the men named in this paragraph were discharged by the company on February 17, 1937, or thereafter, and none of these men were recalled to work by the company upon the resumption of plant operations shortly after February 26th, 1937:" (the names follow).

It cannot be said that independently of the Act respondent was bound to reinstate those who had thus aided and abetted the "sit-down" strikers in defying the court's order. If it be assumed that by virtue of § 2 (3)

they still had the status of "employees," that provision did not automatically provide reinstatement. Whether the Board could order it must turn on the application of the provision empowering the Board to require "such affirmative action, including reinstatement of employees" as will "effectuate the policies" of the Act. We are thus returned to the question already discussed and we think that in that respect these aiders and abettors, likewise guilty of unlawful conduct, are in no better case than the "sit-down" strikers themselves. We find no ground for concluding that there is any policy of the Act which justifies the Board in ordering reinstatement in such circumstances.

*Fifth.* There are nine other persons apparently embraced within the order of reinstatement as to which respondent interposes special objections. As to seven, respondent objects to the reinstatement upon the ground that they were inefficient and that no showing of union activity by any of them was made. As to two others, respondent contends that they refused its request to return to work without any conditions and that their places were accordingly filled.

With respect to these nine persons, and to a miscellaneous group of five others including three as to whom the trial examiner recommended dismissal of the complaint, the Board has not supplied specific findings upon the points in controversy to sustain its order.

We are of the opinion that the Circuit Court of Appeals did not err in setting aside the requirement of reinstatement.

*Sixth. The requirement that respondent shall bargain collectively with Lodge 66 of the Amalgamated Association as the exclusive representative of the employees in the described unit.*

Respondent resumed work about March 12, 1937. The Board's order was made on March 14, 1938. In view of

the change in the situation by reason of the valid discharge of the "sit-down" strikers and the filling of positions with new men, we see no basis for a conclusion that after the resumption of work Lodge 66 was the choice of a majority of respondent's employees for the purpose of collective bargaining. The Board's order properly requires respondent to desist from interfering in any manner with its employees in the exercise of their right to self-organization and to bargain collectively through representatives of their own choosing. But it is a different matter to require respondent to treat Lodge 66 in the altered circumstances as such a representative. If it is contended that Lodge 66 is the choice of the employees, the Board has abundant authority to settle the question by requiring an election.

*Seventh. The requirement that respondent shall withdraw all recognition from Rare Metal Workers of America, Local No. 1.*

While respondent presents a strong protest, insisting that Local No. 1 of the Rare Metal Workers was the free choice of the employees after work was resumed, we cannot say that there is not substantial evidence that the formation of this organization was brought about through promotion efforts of respondent contrary to the provision of § 8 (2), and we think that the order of the Board in this respect should be sustained. Whether Rare Metal Workers of America, Local No. 1, or any other organization, is the choice of the majority of the employees in the proper unit can be determined by proceedings open to the Board.

The provisions of the Board's order contained in Paragraph 1, subdivisions (a) and (b), in Paragraph 2, subdivision (d), and in Paragraph 2, subdivisions (e) and (f) so far as these refer to the first-mentioned provisions, and the final Paragraph of the order dismissing the charge

under § 8 (3) of the Act, are sustained. The other provisions of the order are set aside.

The judgment of the Circuit Court of Appeals is modified accordingly and as modified is affirmed.

*Modified and Affirmed.*

MR. JUSTICE FRANKFURTER took no part in the consideration and decision of this case.

MR. JUSTICE STONE, concurring in part.

I concur in so much of the Court's decision as holds that the Board was without statutory authority to order reinstatement of those employees who were discharged on February 17, 1937. But I rest this conclusion solely on the construction of § 2 (3) and § 10 (c) of the National Labor Relations Act. By § 10 (c) the Board is given authority to reinstate in their employment only those who are "employees." Before the Board made its order, respondent's employees, by reason of their lawful discharge for cause, had lost their status as such, which would otherwise have been preserved to them under § 2 (3).

The National Labor Relations Act, as its purpose and scope are disclosed by its preamble and operative provisions and explained by the reports of the Congressional committees recommending its enactment, Report No. 573, Senate Committee on Education and Labor, 74th Cong., 1st Sess.; Report No. 1147, House Committee on Labor, 74th Cong., 1st Sess., is aimed at securing the peaceable settlement of labor disputes by the prevention of unfair labor practices of the employer and by requiring him to bargain collectively with his employees. Since one means adopted by the Act to secure this end is the reinstatement, by the discretionary action of the National Labor Relations Board, of employees when unfair labor

practices have caused them to cease work, it was necessary to provide that they should not lose their status as employees by reason of that fact. This was accomplished by § 2 (3), which provides:

"The term 'employee'. shall include . . . any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice. . . ."

Having in mind the purposes of the Act and the end sought by the enactment of this section, I think its fair meaning is that attributed to it by the Senate Committee Report, *supra*, pp. 6–7, which declared:

"The bill thus observes the principle that men do not lose their right to be considered as employees for the purposes of this bill merely by collectively refraining from work during the course of a labor controversy. . . . And to hold that a worker who because of an unfair labor practice has been discharged or locked out or gone on strike is no longer an employee, would be to give legal sanction to an illegal act and to deny redress to the individual injured thereby."

But it does not follow because the section preserves this right to employees where they have ceased work by reason of a labor dispute or unfair labor practice, that its language is to be read as depriving the employer of his right, which the statute does not purport to withdraw, to terminate the employer-employee relationship for reasons dissociated with the stoppage of work because of unfair labor practices. The language which saves the employee status for those who have ceased work because of unfair labor practices does not embrace also those who have lost their status for a wholly different reason—their discharge for unlawful practices which the Act does not countenance.

There is nothing in the Act, read as a whole, to indicate such a purpose, and there is no language in § 2 (3) directed to such an end. I cannot attribute to Congress in the adoption of § 2 (3), explained as it was in the Senate Committee Report, a purpose to cut off the right of an employer to discharge employees who have destroyed his factory and to refuse to reëmploy them, if that is the real reason for his action. If a plainer indication of such a purpose had been given by the language of § 2 (3), I should have thought it of sufficiently dubious constitutionality to require us to construe its language otherwise, if that could reasonably be done, leaving it to Congress to say so, in unmistakable language, if it really meant to impose that duty on the employer.

As to the fourteen employees who aided and abetted the sit-down strike, but who were not discharged, I think they retained their status under § 2 (3), and that the Board had power to reinstate them. Whether that power should be exercised was a matter committed to the Board's discretion, not ours.

In other respects I concur with the decision of the Court.

MR. JUSTICE REED, dissenting in part.

This Court agrees with the conclusion of the Labor Board that the respondent was guilty of unfair labor practices, prior to the strike, in campaigning for a company union, isolating the union president, making, through its superintendent, anti-union statements, and employing a labor spy. It also accepts the Board's conclusion that there was further pre-strike violation by respondent of the Labor Relations Act by refusal to bargain collectively. None questions the power of the Board to reinstate striking employees as a means of redress for unfair labor practices. The issue while important

is narrow. Can an employee, on strike or let out by an unfair labor practice, be discharged, finally, by an employer so as to be ineligible for reinstatement under the act?

The issue so stated glows feebly apart from the fire of controversy. But it may permit a more objective appraisal than to examine it when illustrated by conduct on the part of the employees which is thought to put "a premium on resort to force" and to subvert "the principles of law and order which lie at the foundations of society." None on either side of the disputed issue need be suspected of "countenancing lawlessness," or of encouraging employees to resort to "violence in defiance of the law of the land." Disapproval of a sit-down does not logically compel the acceptance of the theory that an employer has the power to bar his striking employee from the protection of the Labor Act.

The Labor Act was enacted in an effort to protect interstate commerce from the interruptions of labor disputes. This object was sought through prohibition of certain practices deemed unfair to labor, and the sanctions adopted to enforce the prohibitions included reinstatement of employees. To assure that the status of strikers was not changed from employees to individuals beyond the protection of the act, the term employee was defined to include "any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice . . ." § 2 (3), Act of July 5, 1935. Without this assurance of the continued protection of the act, the striking employee would be quickly put beyond the pale of its protection by discharge. As now construed by the Court, the employer may discharge any striker, with or without cause, so long as the discharge is not used to interfere with self-organization or collective bargaining. Friction easily engendered by labor strife may readily give rise to con-

duct, from nose-thumbing to sabotage, which will give fair occasion for discharge on grounds other than those prohibited by the Labor Act.

The Congress sought by clear language to eliminate this prolific source of ill feeling by the provision just quoted which should be interpreted in accordance with its language as continuing the eligibility of a striker for reinstatement regardless of conduct by the striker or action by the employer. The constitutional problem involved in such a conclusion is not different from the one involved in compelling an employer to reinstate an employee, discharged for union activity. There is here no protection for unlawful activity. Every punishment which compelled obedience to law still remains in the hands of the peace officers. It is only that the act of ceasing work in a current labor dispute involving unfair labor practices suspends for a period, not now necessary to determine, the right of an employer to terminate the relation. The interference with the normal exercise of the right to discharge extends only to the necessity of protecting the relationship in industrial strife.

The point is made that an employer should not be compelled to reëmploy an employee guilty, perhaps, of sabotage. This depends upon circumstances. It is the function of the Board to weigh the charges and countercharges and determine the adjustment most conducive to industrial peace. Courts certainly should not interfere with the normal action of administrative bodies in such circumstances. Here both labor and management had erred grievously in their respective conduct. It cannot be said to be unreasonable to restore both to their former status. Such restoration would apply to the sit-down strikers and those striking employees who aided and abetted them.

I am of the view that the provisions of the order of the Board ordering an offer of reinstatement to the em-

ployees discussed above should be sustained. As the remainder of the order is affected by the determination upon this issue but not wholly controlled by the conclusions, no opinion is expressed as to the other requirements of the order.

Mr. Justice Black concurs in this dissent.