### NEWPORT INDUSTRIES, Inc. v. LAKE CHARLES METAL TRADES COUNCIL et al.
### Civ. A. No. 2690.

United States District Court
W. D. Louisiana, Lake Charles Division.

Aug. 8, 1949.

518

Thompson, Lawes, Cavanaugh & Hickman, Lake Charles, La., and Kullman & Lang, New Orleans, La., for plaintiff.

Bass & Brame, J. J. Tritico, W. R. Tete, Lake Charles, La., Hirsch & Greene, Baton Rouge, for defendants.

DAWKINS, Chief Judge.

Stated in concise terms, plaintiff (called Newport), a corporation and citizen of the state of Delaware, alleges it is the owner of a naval stores manufacturing plant or factory, situated near the city of Oakdale in the Parish of Allen, Louisiana, embracing some 28 acres, enclosed by an iron fence. It has some two hundred employees, members of District No. 50 United Mines Workers of America, Local Union No. 13,314, and it has a contract of employment with said union; that there is no dispute or disagreement between petitioner and its employees, nor is there any controversy with defendants over terms and conditions of employment; that it also has a contract with the Industrial Development Corporation (called Industrial) created under the laws of Louisiana, for the erection on its said plant site of certain additional buildings for use in its business; that petitioner has no financial or other interests in Industrial, but has simply engaged it to erect said buildings; that Industrial has a contract with Union Construction Workers, District 50, United Mine Workers of America "as the exclusive bargaining agent of * * * employees"; and that no controversy of any kind exists between either petitioner and its employees or Industrial and its employees.

Further, that some nine affiliates of the Lake Charles Metal Trade Council of that city, to-wit: "(a) International Association of Bridge Structural and Ornamental Iron Workers Local No. 678; (b) The United Association of Journeymen and Apprentices of the Plumbers & Pipefitters' Industry of the United States and Canada, Local No. 106 of Lake Charles, Louisiana, Inc. (c) Operative Plasterers & Cement Finishers' International Association of the United States and Canada Local No. 487. (d) International Brotherhood of Boiler Makers, Iron Shipbuilders and Helpers Local No. 561; (e) Bricklayers, Masons & Plasterers' International Union of America Local No. 4; (f) International Brotherhood of Electrical Workers Local No. 861; (g) International Union of Operating Engineers Local No. 407; (h) International Hodcarriers & Common Laborers' Union of America Local No. 207; (i) International Brotherhood of Teamsters, Chauffeurs & Warehousemen and Helpers Local No. 969 have established a picket line about the entrance to petitioner's place of business at Oakdale * * *", which plant is entirely enclosed within a fence and petitioner's employees "have but one means of ingress and egress to their place of employment, that being through a gate fronting

on the public road, known as the 'Old Oberlin Road'"; that between this road and the fence "lies a small parking area in which petitioner's employees and others visiting petitioner's plant park their cars".

Further pertinent allegations of the complaint are quoted as follows:

"That on the morning of July 18, 1949, there were between 250 and 300 pickets placed by the defendants herein about petitioner's place of business, effectively blocking all ingress thereto.

"That the entrance to the parking lot above mentioned, the exit therefrom and the parking lot itself front approximately 300 feet on the Old Oberlin Road; that the roadway leading into the parking lot is approximately 75 feet wide at the place of entrance to the Old Oberlin Road, and approximately 50 feet wide at the place of exit to the Old Oberlin Road from the parking lot.

"That the pickets, acting under and pursuant to the instructions of defendants herein, were massed at the openings of said roadway to a depth of as much as six lines of persons and prevented anyone from entering petitioner's place of business.

"That your petitioner's employees have, through their duly authorized representatives, notified your petitioner that they are ready and willing to perform their usual and customary duties for your petitioner, and are desirous of doing so, but are prevented from so doing because of the presence of said massed pickets.

"That, but for the fear of physical violence, engendered by the presence of said massed picket lines, your petitioner's employees would enter your petitioner's place of business and as a matter of fact, petitioner is advised that certain of said employees have been threatened with physical violence, in the event they attempt to cross said picket lines and enter your petitioner's place of business.

"That, not only has said picket line prevented your petitioner's employees, represented by District 50, United Mine Workers of America, Local Union No. 13314, from entering said place of business, but said pickets have also deterred and prevented your petitioner's supervisory employees from entering said place of business; that some of your petitioner's supervisory employees were threatened with bodily harm and petitioner's employees were only able to get some of the supervisory employees into petitioner's plant, for the purpose of protecting same, by keeping the power department in operation and furnishing necessary fire guards, through the assistance of the Sheriff of Allen Parish.

"That, because of the presence of said massed pickets, petitioner's operations have been completely shut down and your petitioner was, and is, unable to carry on any of its usual and customary business.

"That the use of a massed picket line, under the circumstances herein set forth, is unlawful and because of its resulting in the shut down of petitioner's business is causing your petitioner irreparable injury, for which petitioner has no adequate remedy at law.

"That the loss resulting to your petitioner to date, as a result of the aforesaid unlawful acts of defendants, exceeds the sum of $3,000.00.

"That the identity of all the numerous individuals picketing petitioner's place of business is unknown to your petitioner, but your petitioner believes and alleges them to be connected with and acting under the instructions of and for and on behalf of the defendants herein.

"That, in view of the fact that your petitioner's employees are willing to and desirous of returning to work and are prevented therefrom only because of the presence of the massed pickets, as hereinabove set out, your petitioner believes and, therefore, alleges that unless the relief herein sought is granted, violence will ensue between petitioner's employees and the pickets of the defendant associations; That additionally petitioner alleges that the conduct of the defendant labor organizations in causing the establishment of the aforesaid massed picket line around petitioner's place of business is in violation of the provisions of the Labor Management Relations Act of 1947 (c. 120, Title I, Section 101, 61 Stat. 140, 29 U.S.C.A., Section 158), and

particularly Section 8(b) (1) (A) of said Act, which defines, as an unfair labor practice, the restraining or coercing by any labor organization of employees in the exercise to the rights granted to them."

The prayer is for a temporary restraining order, and on hearing, a preliminary injunction, and finally, that the defendants be permanently enjoined "from mass picketing petitioner's place of business and from, in any manner, interfering with the conduct of petitioner's business, and restraining them from interfering with, intimidating, or coercing petitioner's employees from entering or leaving said place of business or conducting their duties as petitioner's employees".

Attached to the complaint were the following affidavits, to-wit:

(1) By the sheriff of Allen Parish, in which the town of Oakdale is situated, that on the morning of July 18, 1949, he was called to petitioner's plant and:

"That on arrival at said plant he was confronted by mass picketing of the said plant, and that the pickets surrounding said plant numbered from 200 to 300 men;

"That the pickets were refusing to allow any of the workers operating said plant to enter same, and that an undercurrent of violence and possible bodily injury was very prevalent;

"That he returned to the said plant site on the morning of July 19th, and the pickets were still en masse around said plant and numbered from 150 to 200 men;

"That as Sheriff of Allen Parish, and including himself, he only has four paid men available to control the said mass picketing, and that if he were required to reduce the number of pickets so as to take it out of mass picketing, he sincerely believes, in his opinion as a law enforcement officer, that it would be impossible for him to reduce the number of pickets without physical violence;

"That with the present number of men available to control the said mass picketing, the possibility of violence breaking out at any time is imminent, and he fears as Sheriff of Allen Parish, Louisiana, that if a restraining order is not issued, prohibiting this picketing, that violence may erupt at any time, and the lives and safety of the people living in and around said city, and more especially the workers who are now prevented in engaging in their occupations and making a living for their families, would be endangered, with the possible following of the loss of life."

(2) By four of Newport's employees:

"That they, and each of them, are duly employed employees of Newport Industries, Inc., an industrial plant located near the city of Oakdale, in Allen Parish, Louisiana.

"That early on the morning of July 18, 1949, each of your affiants proceeded to the plant of Newport Industries, Inc., to enter upon their day's work within said plant.

"That upon approaching said plant, they observed that the plant was being picketed by a mass picket line consisting of approximately two hundred to three hundred men.

"When they made an attempt to enter said plant, one of the pickets approached each of your affiants and advised them that it would be to their best interests not to attempt to enter said plant, and if they did so they might get hurt. Whereupon, your affiants, feeling an undercurrent of possible mob violence, returned to the city of Oakdale, and up to this time have been unable to enter said plant to perform any of their said duties, all of them being ready and desirous of entering upon their said work."

(3) By the editor of a newspaper published in Oakdale:

"That on the morning of July 18, 1949, it came to his knowledge, as said newspaper man, that a mass picket line had formed around the plant of Newport Industries, Inc., an Industrial plant located in the vicinity of the City of Oakdale, Louisiana, and considering said news worthy of publication, he proceeded to said plant of Newport Industries, Inc., for the purpose of obtaining pictures of said picket line for his newspaper;

"That upon approaching said plant he observed a mass picket line of approximately 200 or 300 men picketing said plant, and that when it was learned that his purpose at said plant was to take pictures of said

picket line, he was approached by some of the picketers, who informed him it would best if he did not take the pictures, and that if he did take any pictures of the picket line, it might be possible that his car would be turned over and wrecked;

"That fearing some form of violence, he decided not to take pictures, but returned to his office in the City of Oakdale, Louisiana."

(4) By E. H. Jones and some twelve other persons:

"That they are all regular employees of Newport Industries, Inc., and are members of Local Union No. 13314, United Mine Workers of America, District 50, Oakdale, Louisiana;

"That as members of such Union they have been designated, and are presently, the sole and only bargaining agents for all of the members of Union No. 13314, being the duly constituted and recognized Union of the employees of the said Newport Industries, Inc., Oakdale, Louisiana;

"That they are ready, willing and desirous of entering the said plant of Newport Industries, Inc., located in the vicinity of Oakdale, Louisiana, a city of approximately 6,500 people, and located in the northern part of Allen Parish, Louisiana, and are not on strike and have no argument whatsoever with Newport Industries, Inc., or any Labor Union or any group;

"That upon approaching their plant they found same picketed by a picket line of approximately 200 to 300 men, and due to the size of said picket line and the feeling and undercurrent going through said picket line, they feared that an attempted entry into the plant would result in physical violence;

"That when a peaceable picket line is placed around said plant, they are ready, willing and desirous of entering said plant and engaging upon the duties for which they were employed;

"That upon ascertaining the existence of said picket line, their Local Union met, and in order to state the true facts concerning the situation existing at Newport Industries, Inc., placed upon the streets of

Oakdale the morning of July 19, 1949, the attached circular, marked Exhibit 'A', which, to the knowledge of your Affiants places the true and correct picture of existing conditions in and around said plant, and raises the possible imminence of physical violence being necessary, unless a restraining order is issued and the picket line reduced to a peaceable picket line." The circular recites that they (affiants) were "Not on Strike,—We are kept from our jobs by outsiders" and likewise explaining their relationship to Newport as completely satisfactory, and further, that affiants and all other employees of complainant are members of said local union No. 13,314 and chose their representatives to deal with their employer "in an election held by the National Labor Relations Board * * * several months ago".

(5) By Fred Ray, Woods Superintendent of Newport:

"That on or about seven o'clock A.M., on July 18, 1949, he reported to the plant of Newport Industries, Inc., to enter upon his day's duties, when he observed a mass picket line picketing said plant, and numbering approximately two hundred to three hundred men;

"As he arrived at the plant and started to enter same, a large group of the pickets jumped in front of his automobile, and he was asked what position he occupied with the plant, and they were informed that he was Woods Superintendent;

"Upon being informed of his position, a large burly picket approached the car and informed him that the plant was being picketed, which was very easily observed, and called to another picket to determine whether or not affiant's name was on a list held by another picket, and upon learning that his name was not on said list, your affiant was informed by said picket that it would be best that he did not try to enter the plant;

"Your affiant then asked the direct question if they meant that force would be used to prevent entrance to the plant, and was informed that they would not say what would be used, but affiant was advised not to try to enter;

"Your affiant ·informed said pickets that unless force were used, he was going to enter said plant, and thereupon started his car forward very slowly, when the picket called, 'All right, boys, step up and let's turn his car over';

"Whereupon, about twenty men seized the left side of his car and affiant could see that violence and force were intended, and informed said pickets that in the face of the situation he would not try to enter said plant, and returned to the city of Oakdale."

(6) By J. R. Blocker:

"That he is employed by Newport Industries, Inc., an ·industrial plant located near the city of Oakdale, Allen Parish, Louisiana, in the capacity of shift foreman;

"That in said capacity of shift foreman, it was his duty to report to work at eight o'clock A.M., and did so report before said time on the morning of July 18, 1949."

(7) By Philip T. Cornelius:

"That he is employed by Newport Industries, Inc., an industrial plant located near the City of Oakdale, Allen Parish, Louisiana, in the capacity of Assistant Superintendent in charge of operations;

"That on the morning of July 18, 1949, he received a call from Mr. Harold Rose, plant manager at Newport Industries, Inc., informing him that apparently a shutdown of the plant was necessary, and that his presence to supervise the emergency shut-down was needed;

"That he was told that the plant was being picketed, and that when he approached the plant to call for the man in charge, who in turn had his name on his list, and that he would be admitted to the said plant;

"That upon approaching the said plant at about 7:00 or 7:15 A.M., on the morning of July 18, 1949, he noticed a huge mass picket line surrounding the said plant, and that as he approached the entrance to the offices of said plant, he was accosted by about thirty men and was told to keep moving;

"That your affiant, in turn, asked for the man in charge and informed the picketers that his name was on the list of admission to the plant, and your affiant was in turn informed that the list had long since been used up, and that all the men to be admitted were already admitted, and that the men who stopped him were in charge, and that if he did not keep moving, he would be moved, whereupon your affiant left the plant and drove some few hundred yards away, and then stopped to converse with another employee who had been refused admittance;

"That while he was conversing with the said employee, one of the men from the picket line approached him, introduced himself and told him that if he would return to the plant with him, that he would be admitted and escorted to the plant, which was done;

"That prior to his introduction to the picketer, your affiant was in fear of mob violence by the said picketers, and left the plant."

(8) By Harold E. Rose:

"That he is at present the Plant Superintendent for Newport Industries, Inc., an industrial plant located in the vicinity of Oakdale, Allen Parish, Louisiana, employing some two hundred thirty men in the operation of said plant;

"That at approximately 5:40 A.M., on July 18, 1949, he received a call from his watchman at said plant, and was informed that a large group of strange men had driven to the plant site and were presently milling around the outside entrance;

"That affiant immediately proceeded to said plant and found a mass picket line forming, consisting of some two hundred to three hundred men to picket said plant;

"That your affiant was immediately recognized as Plant Superintendent and was admitted to the grounds of said plant without delay;

"However, when the first shift of men was to go on duty at 6 A.M., these men were not permitted to enter and it became necessary that an emergency shutdown be ordered of the complete plant;

"That the subsequent shifts which were to have arrived at 7 A.M., and 8 A.M., of the same day were not permitted to enter,

and it became necessary to retain the personnel who had already worked eight hours, on duty until almost noon, in order to shut down the said plant;

"That the plant itself was greatly endangered, because when the Operating Superintendent, whose technical advice was most urgently needed in the case of shutdown, arrived for admittance, for quite some time he was refused admittance, and the shift foreman, who was also necessary in the completion of the shutdown was not allowed to enter the plant at all during the day, and their absence necessitated proceeding with men who were not qualified to perform such duties. They further refused admittance to the Chief Electrician, and to the Fire and Safety Marshal;

"The Chief Electrician and Fire and Safety Marshal were never allowed admittance to the plant; however, after the shutdown process had gotten well under way, the Operating Superintendent was finally allowed admittance, but the shift foreman was not allowed admittance at any time during the shutdown;

"All of these greatly endangered the plant itself;

"It was also with the greatest of difficulty that the office force, so necessary for the administrative operation of the plant, were finally given admittance;

"Up until the time of making this affidavit at 12 M., July 19, 1949, said plant of Newport Industries, Inc., is still under the duress of mass picketing."

On the return day of the rule, July 28, 1949, counsel for all defendants filed a joint motion to dismiss the complaint on the following grounds:

"This court lacks jurisdiction ratione materia, in that:

"1. This action involves a labor suit wherein plaintiff, a private party, is seeking injunctive relief without alleging strict compliance with prerequisites of Norris-LaGuardia Act.

"2. Plaintiff has not alleged exhaustion or even pursuit of its remedies under the Labor Management Act.

"3. The National Labor Relations Board is the exclusive agent under the Labor Management Act to petition for injunctive relief in a labor dispute.

"4. Plaintiff has not alleged in the conjunctive those prerequisites for injunctive relief, when sought by a private party, prescribed by section 7 of the Norris-LaGuardia Act. (29 U.S.C.A. § 107).

"(a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be committed unless restrained but no injunction or temporary restraining order shall be issued on acount of any threat or unlawful act excepting against the person or persons, association or associations or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;

"(b) That substantial and irreparable injury to complainant's property will follow;

"(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

"(d) That complainant has no adequate remedy at law; and

"(e) That public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection;

"(f) That notice of this hearing has been given to the chief of those public officials of the parish and city within which the alleged unlawful acts have been threatened or committed charged with the duty to protect complainant's property;

"5. That plaintiff has not alleged that it has complied with all requisites and obligations imposed on it by law in connection with the labor dispute in question and that it has made every reasonable effort to settle such dispute either by negotiations or with the aid of any governmental machinery of mediation or voluntary arbitration, all as prescribed by section 8 of the Norris-LaGuardia Act (29 U.S.C.A. § 108);

"6. That plaintiff's petition does not allege that the acts complained of were done with the authorization of defendants or

that they were ratified after defendants received actual knowledge thereof, as required by section 6 of Norris-LaGuardia Act (29 U.S.C.A. § 106).

"7. That plaintiff's petition does not allege sufficient facts to bring this action within the jurisdiction of this Court."

Counsel for defendants were asked by the Court if they intended to file any answer to the rule on its merits, and replied that they did not, but would stand on the motion to dismiss.

At the hearing, counsel for the National Labor Relations Board appeared and asked leave to file a motion to intervene, which was not formally allowed at the time, but counsel was informed that he would be permitted to present the Board's contention by oral argument and brief, which was and has been done, and that the question whether the intervention should be allowed would be determined later on along with the motion to dismiss.

Attached to the motion for leave to intervene was also one to dismiss, which asserts that this Court "is without jurisdiction of the subject matter", for the reason that

"(a) The Board is exclusively empowered by the National Labor Relations Act as amended (Labor Management Relations Act, 1947, Title 1, Section 101, Pub.Law No. 101, 80th Cong., 1st Sess., June 23, 1947 [29 U.S.C.A. § 151 et seq.]) to petition the district courts of the United States for injunctions or restraining orders in cases such as this instant case involving the alleged commission of unfair labor practices within the meaning of said Act, and

"(b) The district courts of the United States are not granted jurisdiction to allow injunctions or damage sought by private parties in such cases.

"(c) Plaintiff has failed to exhaust his administrative remedy under the provisions of the National Labor Relations Act, as amended."

Inasmuch as the Board's motion has the effect of making common cause with the defendants as to this Court's jurisdiction and adds no other issues, the intervention will be allowed for the purposes of the motions to dismiss. In oral argument counsel for defendants also called attention to the failure of complainant to allege the citizenship of all the defendants. Since this matter was submitted, the Court has permitted complainant to file an amended bill stating that the defendants are all citizens of Louisiana. This was done under the provisions of the Federal Rules of Civil Procedure, 28 U.S.C.A., and in view of the general practice, which permits the supplying of such allegations to establish jurisdiction, even by affidavits filed in the record.

## Opinion

[1] Of course, the motion to dismiss admits all the well pleaded facts of the complaint, including those in the attached affidavits or exhibits made part thereof.

It is believed that none of the cases cited by counsel on either side has involved a situation at all analogous to that shown here. It appears that the complainant has in the operation of its plant a contract with a union, recognized and approved by the National Labor Relations Board, pursuant to an election held by that Board for said purpose; that it neither has a dispute with its said employees, nor one with the defendants, with respect to conditions or terms of employment or as to what union shall represent them; that the controversy is solely between an independent contractor, who has undertaken to erect additional buildings on complainant's site, and a third union, with which the said contractor likewise has an agreement, on one side, and the defendants on the other, and that the purpose of the picketing is to induce the contractor to dispense with the services of this third union and to employ or enter into a contract with some of the defendant local unions.

[2] The matter is further complicated by the physical situation at the plant. It is enclosed by a fence with but one entrance for both the officers and employees of complainant and those of the contractor, so that picketing of the latter necessarily results in picketing of complainant. If the circumstances were such that the controversy between the employees of the con-

tractor and the picketing unions would not impinge upon the operations of complainant's plant, then it might be said in the light of some of the cited decisions that there is a labor dispute within the meaning of the Norris-LaGuardia Act. However, it is believed that the facts alleged and which counsel for defendants concede are admitted by the motion to dismiss, without further pleading, do not create a situation covered by the said statute. Complainant would have no standing to appeal to the Labor Board or any other agency for the adjustment of a controversy between the employees of an independent employer and the defendant unions. That could be done only by that employer or one of the contending unions.

For the same reasons it is not believed that the case is affected by the Taft-Hartley Act.

On the other hand, complainant has, because of the fact that its plant is enclosed in a high metal fence, with but one opening or entrance, for it and its employees, and for those of the contractor, made it impossible for the defendants to pursue even legitimate means of pressing their contentions against the contractor or its employees, without, at the same time, involving complainant's own activities.

An extended citation and discussion of cases having no resemblance to this one, in the features stated, would serve no useful purpose. It is sufficient to say that while, so far as this Court can find, the Supreme Court has not yet passed upon the question of whether mass picketing puts the picketers outside of the benefits of the Labor Relation statutes, it has been held that a seizure of private property in such circumstances as to dispossess the owner thereof, is illegal. National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599. Whether it may eventually be held that even that extreme action, under the present state of the law and jurisprudence, will require appeal to the slow, tedious processes of the Norris-LaGuardia and Taft-Hartley Acts, remains to be seen. It is unnecessary in the opinion of this court to decide that issue here.

Careful consideration has convinced me that, since this is not a labor dispute and the Taft-Hartley Act is not involved, the case is one in which, under its general equity powers, this Court may require such action as will be calculated to relieve the situation without undue prejudice or hardship to either side. It has been informed that Industrial has already filed in the State Court a proceeding to contest its rights in the dispute between its employees and the defendants. All the parties in that action are citizens of Louisiana and that Court, therefore, has the power to determine those issues in its own way.

▮ For the above reasons and in view of the fact that the physical condition of complainant's plant makes it possible for the contractor to benefit from any ruling favorable to the former, it is believed that equity justifies this Court in requiring, as a condition of the granting of the preliminary injunction herein, that plaintiff shall provide a separate entrance to its plant at a point substantially removed from the present one, to permit the contractor and his employees to enter and leave without the involvement of the personnel of complainant.

Proper decree should be presented.