The A. S. ABELL COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 78–1265.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 7, 1979.

Decided May 24, 1979.

---

Gil A. Abramson, Baltimore, Md. (James P. Garland, Semmes, Bowen & Semmes, Baltimore, Md., on brief), for petitioner.

L. Joseph Ferrara, N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Marjorie S. Gofreed, N. L. R. B, Washington, D. C., on brief), for respondent.

Arthur B. Hanson, Frank M. Northam, Mitchell W. Dale, Hanson, O'Brien, Birney & Butler, Washington, D. C., on brief, for amicus curiae American Newspaper Publishers Association.

Before BRYAN, Senior Circuit Judge, and WIDENER and PHILLIPS, Circuit Judges.

BRYAN, Senior Circuit Judge:

The National Labor Relations Board on February 8, 1978, found that The A. S. Abell Co., Inc. (the Sun), a unionized publisher of several newspapers in Baltimore (Sun papers), had transgressed the provisions of the Board's organic Act which forbade conduct delineated therein as unfair employer practices.[1]  234 N.L.R.B. No. 131 (1978).  The offense charged was the accused's withholding on November 15, 1975, of employment from a worker on account of his membership in a labor organization.[2]

Specifically, the misdoing imputed to the Sun was its refusal to employ one Kenneth Swiggart, then a union pressman idled because of a strike at The Washington Post, a publication in the District of Columbia. The Sun grounded declination of his employment upon the need for time to allow it to ascertain whether he was in any way linked to a violent riot of the pressmen of Local 6, International Printing and Graphic Communication Union, at the Post on October 1, 1975.

For this determination and action, the Board ordered that the Sun cease and desist from discouraging union membership or interfering with its employees' rights to en-

---

[1]  29 U.S.C. § 151 et seq. (1947 and as amended).

[2]  29 U.S.C. § 158(a)(1) and (3) (1974):
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; [Section 7 of the Act—the right to form or join a labor organization]
  \*    \*    \*    \*    \*    \*
(3) by discrimination in regard to hire or tenure of employment . . . to . . . discourage membership in any labor organization. . . .

gage in union activities. It also directed the Sun to offer Swiggart immediate employment at a position similar to the one in which he would have been employed, had the Sun not discriminated against him.

On the Sun's petition, we decline to enforce the Board's order for want of substantial evidence on the record as a whole to support it. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Although the facts for the most part are not in dispute, the recital of them must be enlarged to subsume the events preceding and following the riot in order to afford a complete understanding of the decision.

On extraordinary occasions non-working pressmen are customarily taken on by the regular printers' staff of a newspaper, if extra help is made necessary by an emergency. When occurring at the Sun, the demand was usually met by Local 31, at Baltimore, of International Printing and Graphic Communication Union, which on call would refer idle printers to the Sun. As will appear, this practice came under intensive concern in the fall of 1975, with the contract between the Post and Local 6 expiring at midnight on September 30, and the contract between the Sun and Local 31 ending December 31. The latter was an extension of the originally fixed termination, agreed upon after a strike had been voted but was still pending.

The September 30 termination date brought Local 6's membership at the Post into an open meeting that continued into the dawn hours of the next day. Approximately 100—about a half of the total number of pressmen—were there, readied for work. Eight to twelve non-scheduled press workers were also in the gathering.

At 4 o'clock, the morning of October 1, the meeting of Local 6 voted to strike the Post. Whereupon, suddenly and without forewarning of any kind, the meeting turned into a riot in the Post's pressroom. The foreman was beaten, the presses set afire, the related equipment destroyed and the remaining printing auxiliaries turned into shambles. Following close upon the devastation and violence was the posting of pickets around the building.

Accounts of the rampage and plundering spread at once through newspapers, radio, telephone and telecasts. The moblike disruption and destruction were further publicized by photographs and headlines in Maryland, Virginia and the District of Columbia.

The Post, the Police Department of the District of Columbia and a grand jury sitting in its Superior Court undertook an investigation into the identity of those who participated in the sacking of the pressroom. It is not unthinkable that by then Swiggart was known to have been a member of Local 6 at the Post when the upheaval occurred and immediately thereafter to have joined the picketers of the plant.

With Local 6 on strike, the Sun was faced with deciding whether it should accept any of the strikers as extra pressmen in their non-working period if referred during an emergency. After thorough consideration and consultation with Local 31, the Sun resolved that it should refuse referral of Local 6's unemployed strikers until clarification as to which members of Local 6 were rioters at the Post. As anticipated by the Sun, three or more of Local 6's strikers, including Kenneth Swiggart, were referred by Local 31 on the night of November 15, in response to an emergency call of the Sun. Pursuant to the earlier resolve of the Sun, none of the applicants was accepted.

The Board makes this rejection of Swiggart the fulcrum of its present accusation of the Sun: that its denial to Swiggart of employment, because of his affiliation with a union, was a practice prohibited by the Act, that is, Section 7 (assuring an employee the right to join a labor organization) and Section 8(a)(1) and (3) (outlawing interference with or discouragement of this right) 29 U.S.C. §§ 157 and 158(a)(1) and (3).

In our view, the evidence is incontestable in revealing that the Sun's actions were fair and equitable in the circumstances "to protect [his] property or preserve discipline

against the unlawful conduct of employees." *Maryland Drydock Co. v. NLRB*, 183 F.2d 538, 539 (4th Cir. 1950). *See NLRB v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 257–58, 59 S.Ct. 490, 83 L.Ed. 627 (1939). At that time—less than seven weeks after the riot—it was altogether reasonable for the Sun to be apprehensive lest it suffer a repetition of the unlawfulness lately visited upon a like enterprise in Washington, only 40 miles distant.

Identification of those to blame for the uprising had advanced only sketchily. The grand jury had not reported, nor had the Post discontinued its efforts. As the Board briefs it (p. 16), "[T]he Post had *tentatively* identified a *number* of employees responsible for the property damage and had compiled an additional list of *suspects.*" (Accents ours). A vice-president of the Post testified that if he had been approached by the Sun, he would not have divulged to it any information he possessed concerning the names of the individuals whom he had reason to believe had participated in the October 1 violence.

The Sun was not required to name the guilty parties in order to acquit itself of the Board's indictment. That Swiggart's name was not among the suspects scarcely disclosed infirmity in the Sun's reasoning for turning him down. To repeat, he had picketed with Local 6's strikers just after the row. This behavior surely was far from reassuring that his presence in the Sun's pressroom was not to be feared. After the holocaust created at the Post by the aggregation of which he was a member, so recently and close by, we cannot agree that the Sun could not permissibly have pondered Swiggart's affiliations. His retention would have been at least incautious. This was not because his guilt had been established, or because the Sun had knowledge that Swiggart was connected with the riot, but rather on account of the prevailing uncertainty of Local 6's trustworthiness. These facts are proof teeming of the Sun's "valid, substantial business justification" for refusing Swiggart's request of it. *Johns-Manville Products Corp. v. NLRB*, 557 F.2d 1126, 1133 (5th Cir. 1977), *cert.*

*denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978).

Again, his exclusion by the Sun was but slightly incursive upon Swiggart's entitlements. His hiring was deferred only until Local 6's trespassers upon the Post could be arraigned. The Sun did not in any way harm Local 6's employment program, for the rejectees all the while remained the Post's employees. It gave no offense to Local 31, since any of its idle members were referable to the Sun when the Sun was in want of help.

Conclusive of the Sun's good faith in dismissing Swiggart from consideration is the absence throughout of any union animus on the Sun's part, presently or in the past. Over the years it had negotiated with labor organizations with little discord, if any, and had historically hired for extra help members of striking unions from other papers, among others.

The decision of the Board cannot prevail.

Enforcement of Order Denied.